UNITED STATES of America, Appellee,

v.

George M. BUCUVALAS, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Aristedes C. PORAVAS, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Arthur L. VENIOS, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

BEL–ART REALTY, INC.,
Defendant, Appellant.

Nos. 90-2180, 90–2181, 91–
1018 and 91–2042.

United States Court of Appeals,
First Circuit.

Heard April 6, 1992.

Decided July 22, 1992.

Rehearing and Suggestion for Rehearing
En Banc Denied Aug. 27, 1992.

938

Morris M. Goldings with whom David R. Kerrigan, Mahoney, Hawkes & Goldings, Terry Philip Segal, Segal & Feinberg, and Kevin O'Dea, Boston, Mass., were on brief for appellants.

Carole S. Schwartz, Special Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., and Stephen P. Heymann, Asst. U.S. Atty., Boston, Mass., were on brief for appellee.

Before CYR, Circuit Judge, and COFFIN and CAMPBELL, Senior Circuit Judges.

CYR, Circuit Judge.

Defendants George M. Bucuvalas, Aristides C. Poravas, and Bel–Art Realty, Inc., appeal their convictions on two counts of engaging, and conspiring to engage, in a pattern of racketeering activity, 18 U.S.C. § 1962(c)-(d), multiple counts of mail fraud, 18 U.S.C. §§ 1341 and 2, and one count of conspiring to commit mail fraud, 18 U.S.C. § 371. Arthur L. Venios appeals his convictions for mail fraud and conspiracy to commit mail fraud. We affirm the convictions.

I

BACKGROUND

From 1980 to 1987, Bucuvalas, Poravas, and Venios [hereinafter "defendants"] owned and operated a number of nightclubs, peep shows, movie theaters, and adult bookstores in Boston's Combat Zone (adult entertainment district), which were managed from offices owned by defendant Bel–Art Realty, Inc. [hereinafter "Bel–Art"] at 671 Washington Street. In order to be allowed to operate many of these establishments, it was necessary to obtain

alcoholic beverage licenses, *see* Mass. Gen.L. ch. 138, §§ 1–78 (1991), and entertainment licenses, *see* Mass.Gen.L. ch. 140, §§ 181–185G, from municipal licensing boards to which the applicants were obligated to disclose the identity and background of all owners and managers of the premises to be licensed.[1]

In an attempt to conceal their prior criminal records, as well as their interests in the various enterprises, defendants paid "straw" persons and created sham corporations to "front" as record owners and operators and, through the use of the United States mails, utilized the names of these straw owners on license applications submitted to the municipal licensing boards. Bel–Art, which was controlled by one of defendants' coconspirators, aided the fraudulent scheme by executing several mock real estate "leases" to the straw owners. Unaware of these misrepresentations, the municipal boards issued licenses to the ostensibly independent and legitimate business establishments, and subsequently renewed their licenses on an annual basis. The scheme served a secondary purpose as well. When the municipality would threaten to revoke a license for violation of its conditions, or the Commonwealth of Massachusetts would attempt to collect back taxes, defendants merely arranged a sham sale of the establishment to a new straw owner. For good measure, between 1980 and 1986 Bucuvalas and his coconspirators bribed licensing board members and police officers to avoid accountability for infractions which might otherwise have resulted in license suspensions or revocations.

In February 1989, the defendants were indicted on two RICO counts and multiple counts of mail fraud[2] and conspiracy to commit mail fraud. The RICO counts alleged nine predicate acts of mail fraud and six acts of bribery. The government sought criminal forfeiture of several parcels of Bel–Art's real property which allegedly "afforded the defendant ... a source of influence over the [RICO] Enterprise." *See* 18 U.S.C. § 1963(a)(2). Following a fourteen-day trial, the jury returned guilty verdicts on all counts against all defendants, as well as an *in personam* criminal forfeiture verdict against certain Bel–Art properties.

## II

## DISCUSSION

### A. *Motion to Suppress*

On September 25, 1987, FBI Special Agent Robert Jordan obtained a warrant to search Bel–Art's second-floor offices at 671 Washington Street, the reputed headquarters of the individual defendants' illegal enterprise. The search warrant authorized seizure of "records, documents, notes and physical objects evidencing [defendants'] ownership or control" of various businesses. Bel–Art moved to suppress the seized evidence on the grounds that the warrant was not supported by probable cause and did not describe with sufficient particularity the items to be seized. *See* U.S. Const. amend. IV. The district court denied the motion.

### 1. Probable Cause

Bel–Art contends that the affidavit accompanying the search warrant application did not establish probable cause to believe that documentary evidence of the alleged

---

**1.** Chapter 138, section 15A, requires applicants to include "a sworn statement ... giving the names and addresses of all persons who have a direct or indirect beneficial interest in said license." The chairman of the alcoholic beverage licensing board testified that the board also "require[d] a criminal record affidavit to be filed." Chapter 140, section 181, authorizes the Mayor's Office of Consumer Affairs and Licensing to obtain all "reasonable information concerning the conditions of the premises and actions to be taken to prevent danger to the public safety, health, or order." The commissioner testified

that applicants were expected to complete "criminal record information forms" on all principals of the licensed premises.

**2.** The mail fraud counts charged that the fraudulent scheme had two purposes:

a. defrauding the City of Boston in order to obtain money and property by means of false and fraudulent pretenses, representations and promises; and

b. defrauding the United States and the Commonwealth of Massachusetts of taxes.

fraudulent scheme would be found at the search premises. Bel–Art characterizes most of the information in the affidavit as "stale," insofar as it related to events (the employment of straw owners and the bribery of board members and police officers by defendants or their coconspirators) which took place between 1960 and 1983, none less than four years prior to the search warrant application.[3]

■ The probable cause determination is to be upheld if, "given all the circumstances set forth in the affidavit ..., including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a *fair probability* that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (emphasis added); *see United States v. White*, 766 F.2d 22, 25 (1st Cir.1985); *Rahn*, 511 F.2d at 293 (affidavit need not demonstrate "certainty" that items will be found). Moreover, the supporting affidavit must be viewed in a practical, "common sense" fashion, and we accord considerable deference to reasonable inferences the judicial officer may have drawn from the attested facts. *See United States v. Falon*, 959 F.2d 1143, 1147 (1st Cir.1992) (citing *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965)); *United States v. Tabares*, 951 F.2d 405, 408 (1st Cir.1991).

■ Staleness does not undermine the probable cause determination if the affidavit contains information that updates, substantiates, or corroborates the stale material. *See Emery v. Holmes*, 824 F.2d 143, 149 (1st Cir.1987); *United States v. Ciampa*, 793 F.2d 19, 24 (1st Cir.1986); *United States v. Moscatiello*, 771 F.2d 589, 597 (1st Cir.1985); *United States v. Viegas*, 639 F.2d 42 (1st Cir.), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981). Moreover, whether "averments in an affi-davit are sufficiently timely to establish probable cause depends on the particular circumstances of the case." *United States v. Hershenow*, 680 F.2d 847, 853 (1st Cir. 1982); *see also United States v. Di Muro*, 540 F.2d 503, 516 (1st Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977), and *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). Staleness is not measured merely on the basis of the maturity of the information but in relation to (1) the nature of the suspected criminal activity (discrete crime or "regenerating conspiracy"), (2) the habits of the suspected criminal ("nomadic" or "entrenched"), (3) the character of the items to be seized ("perishable" or "of enduring utility"), and (4) the nature and function of the premises to be searched ("mere criminal forum" or "secure operational base"). *Moscatiello*, 771 F.2d at 597 (quoting *Andresen v. State*, 24 Md.App. 128, 331 A.2d 78 (1975)), *aff'd*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *see also Rivera v. United States*, 928 F.2d 592, 602 (2d Cir.1991); *Rahn*, 511 F.2d at 293.

■ The evidence detailed in Agent Jordan's supporting affidavit defines an "entrenched," "regenerating" criminal conspiracy which was sustained and perpetuated through an extensive web of fraudulent license applications, renewals, "straw" ownerships, and a pattern of bribes extending over a period of at least seven years. Although most events described in the affidavit occurred before 1983, a reliable informant reported that he saw one of the defendants' coconspirators bribe a Boston police officer as recently as August 1987, just one month before the search warrant. In addition, through licensing board records Agent Jordan verified that a person identified to an informant in 1980 as a straw owner was still designated a record owner on license renewal applications filed in be-

---

**3.** Bel–Art challenges the affidavit on the ground that neither the affiant, Special Agent Jordan, nor his sources, directly observed any incriminating evidence at the Bel–Art premises prior to the warrant application. However, since circumstantial evidence alone may establish probable cause, the affidavit would not have been rendered fatally defective for this reason alone. *See United States v. Rahn*, 511 F.2d 290, 293 (10th Cir.) (lack of direct observation of weapon not fatal to "probable cause" showing where "individuals [normally] keep weapons in their homes."), *cert. denied*, 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975).

half of one of the defendants' business establishments as late as 1986.

The affidavit presented enough circumstantial evidence from which a judicial officer reasonably could have inferred that documentary and physical evidence of the alleged ongoing conspiracy would be located in the second-floor Bel–Art offices at the time of the search. From 1980 through September 1987, the suite of offices at 671 Washington Street served as the apparent hub of directive activity for defendants' illegal enterprise and the central repository for important records relating to the ownership and operation of their various businesses.[4] It would be reasonable to infer that licensing information, documentary evidence, and important records relating to the ownership and operational control of an enterprise conducted at numerous, dispersed locations probably would be kept at some secure, centralized location, especially records of "enduring utility." The likelihood that Bel–Art's second-floor office suite at 671 Washington Street was the central repository for the business records of the criminal enterprise was corroborated on September 18, 1987, just days before the search warrant issued, when police officers conducted a license inspection at one of defendants' establishments, observed an illegal amusement device, and asked the manager to produce a license. The manager referred the inspecting officers to the second-floor offices at 671 Washington Street, where the officers observed defendant Poravas placing papers in one of four filing cabinets. While on the premises, the officers noticed video monitors which afforded the occupants of the second-floor offices a clear view of the entrance to the office suite at all times, indicating the likelihood of a "secure operational base."

We think the net "common sense" import of the information presented in the search warrant affidavit was sufficient to establish a "fair probability" that the premises at 671 Washington Street were a "secure operational base" and the centralized repository for the records of the suspected criminal enterprise.

### 2. Particularity of Search Warrant

■ Bel–Art contends that the breadth of the search warrant description of the evidence to be seized left too much to the discretion of the search party, inviting the sort of "general rummaging" for evidence forbidden by the Fourth Amendment. *See United States v. Abrams,* 615 F.2d 541, 543 (1st Cir.1980).[5] Ignoring the transitional phrase ("and, in particular") between the first and second clauses of the warrant description, Bel–Art asks us to read the first clause (identifying the suspected crim-

---

4. We recite some of the information in the affidavit. The offices were the site of meetings in 1981, at which were discussed plans for bribing licensing board members. A coconspirator's employee reported that, as of 1982, the daily income and receipts generated at defendants' various establishments were routinely delivered to these offices. In January 1987, another employee told a police officer that entertainment licenses were kept at these second-floor offices. Shortly after delivering a notice of a licensing board hearing to defendant Poravas on September 12, 1987, a police officer saw Poravas enter the second-floor offices.

5. The evidence was described as follows:

[R]ecords, documents, notes and physical objects which constitute evidence of and instrumentalities of violations of 18 U.S.C. §§ 1961(c) and (d) (i.e., conducting and participating in the affairs of an enterprise, and agreeing to do so, through a pattern of racketeering activity consisting of multiple acts of bribery and mail fraud), Title 18, U.S.C.

§ 1341, and Title 18 U.S.C. § 371, *and, in particular,* records, documents, notes and physical objects evidencing the ownership and control of businesses in the Combat Zone in Boston, as described in ¶ 10 of the Affidavit of Special Agent Robert J. Jordan, which are licensed by the Boston Licensing Board and/or the Mayor's Office of Consumer Affairs and Licensing Division ... and the payment of bribes to public officials with regulatory authority over such licensed premises; said records, documents, notes and physical objects to include licenses or copies thereof, personnel records and payroll records, a list of employees, checkbooks and check stubs, accounting books and ledgers, invoices, corporate books and records, including stock ledgers, documents bearing the names and/or telephone numbers of police officers or other municipal officials, citations, incident reports, correspondence, and supplies and objects used in the operation of the listed businesses, including peep show tokens and automatic amusement devices. (Emphasis added.)

inal offenses) independently of the particularized list of items which follows. Accordingly, Bel–Art contends that the first clause authorized the searching officers to engage in a generalized rummaging for any item discovered on the search premises, whether or not of the type particularly described in the second clause. We do not agree.

The warrant authorized a search for the types of documentary evidence particularly described in the second clause of the warrant, the first clause serving the broader, yet defining, purpose of identifying the criminal offenses the target evidence was expected to establish.[6] Thus, but for the search constraints in the second clause we might agree that the particularity requirement of the Fourth Amendment would not have been met. In light of the specific types of items described in the second clause, however, the warrant met the Fourth Amendment particularity requirement. *Cf. Abrams*, 615 F.2d at 547 (general "tail" clauses will not negate earlier particularity in main body of description) (citing *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976)). Unlike cases in which we have held that the breadth of the search authorization exceeded the scope of the "probable cause" showing, *see, e.g., id.* at 543 (warrant authoriz-

ing search for all medical records overly broad where criminal conduct related to Medicare and Medicaid fraud); *Application of Lafayette Academy, Inc.*, 610 F.2d 1, 3–4 (1st Cir.1979) (authorization to search for all books and papers held overly broad in FISLP-related fraud case), the second clause of the description in the instant warrant tracked the allegations of clandestine ownership for which probable cause was established in the accompanying affidavit, *see, e.g., Tabares*, 951 F.2d at 408 (description of records of ownership and control sufficiently particular), as well as the allegations of ongoing license infractions at satellite establishments.[7]

## B. *Mail Fraud*

A general verdict which may have been based on an impermissible alternative ground must be vacated. *United States v. Kattar*, 840 F.2d 118, 123 (1st Cir.1988) (citing *Zant v. Stephens*, 462 U.S. 862, 881, 103 S.Ct. 2733, 2744–45, 77 L.Ed.2d 235 (1931)).[8] Although the defendants could have been convicted of mail fraud on the independent ground that they deprived the Commonwealth of Massachusetts of tax revenues, they argue that *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987),[9] precluded their convictions for fraudulently depriving the City

---

**6.** Bel–Art likewise challenges the last clause in the warrant description ("including peep show tokens and automatic amusement devices") on the ground that "this general phrase is not sufficiently limited by preceding language to evidence of a specific crime." By this argument, Bel–Art would have us ignore the first clause in the warrant description, while contending elsewhere that the first clause controlled the second to the point that it gave the executing officers *carte blanche* authority to rummage. Of course, the scope of the last clause in the warrant description is similarly informed by the first and second clauses.

**7.** Bel–Art argues that the warrant description should have been limited to documents prepared after 1980, the alleged date of the commencement of the conspiracy. *See Abrams*, 615 F.2d at 543. However, we have never required such arbitrary limitations in warrant descriptions. *Id.* ("[T]here is *no* limitation as to time *and* there is no description as to what specific records are to be seized.") (emphasis added); *see also Lafayette*, 610 F.2d at 4 n. 4 ("[E]fforts

may also be required to narrow the documents by category, time periods, *and the like.*") (emphasis added). Temporal delineations are but one method of tailoring a warrant description to suit the scope of the probable cause showing.

**8.** The district court instructed the jury to decide whether the unissued licenses were "property" in the hands of the city. We need not consider whether the "property" issue determination was for the jury, as defendants contend that *McNally, as a matter of law,* compels the conclusion that unissued licenses are not "property."

**9.** Congress subsequently amended the mail fraud statute to nullify the *McNally* rule. *See* 18 U.S.C. § 1346 ("the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."). The government does not advocate retroactive application of the amended statute. *See United States v. Bush*, 888 F.2d 1145, 1145–46 (7th Cir.1989) (*ex post facto* concerns bar retroactive application of § 1346 to pre–1988 criminal conduct).

of Boston of its *unissued* liquor and entertainment licenses, since the city held no cognizable "property" interest in the *unissued* licenses.

*McNally* rejected the "intangible rights" theory as a basis for mail fraud prosecutions brought by the federal government against corrupt state and local officials.[10] The *McNally* defendants allegedly used political office and influence, and their control over the selection of insurers from which the State would obtain insurance coverage, to funnel excess commission payments to insurance agencies either owned or controlled by the defendants. *Id.* at 352–54, 107 S.Ct. at 2877–79. Since comparably priced insurance coverage would have been required in any event, the government neither contended that the alleged scheme violated state law, *id.* at 361 n. 9, 107 S.Ct. at 2882 n. 9, nor that it resulted in ascertainable pecuniary loss to the State. *Id.* at 360, 107 S.Ct. at 2881. Rather, the prosecution depended entirely on the theory that defendants' breach of their fiduciary duty as state officials defrauded citizens of their intangible right to honest state government. *Id.* at 354 n. 4, 356, 107 S.Ct. at 2878 n. 4, 2879.

In reversing defendants' convictions, the Supreme Court acknowledged that section 1341 seemingly permitted conviction *either* for a "scheme to defraud" *or* for a "scheme [to] obtain[ ] money or property by means of false or fraudulent pretenses, representations, or promises." *Id.* at 358, 107 S.Ct. at 2880. The Court nevertheless rejected the government's contention that the more general phrase—"scheme to defraud"—permitted prosecutions for deprivation of the intangible right to honest government involving no property loss to the defrauded party. Consulting the "sparse" legislative history of section 1341, *id.* at 356–57, 107 S.Ct. at 2879–80, the Court held that the traditional meaning of the term "defraud" is limited to a deprivation of property rights. *Id.* at 358–59, 107 S.Ct. at 2880–81. Accordingly, where the *government* is the defrauded party, "any benefit which the Government derives from [section 1341] must be limited to the Government's interests as property holder." *Id.* at 358–59 n. 8, 107 S.Ct. at 2880–81 n. 8.

*McNally* held that the intangible right to good government is *not* "property," but offered no insight as to the types of interests which might be deemed "property" in the hands of the government for purposes of the mail fraud statute. Shortly thereafter, however, the Court seemed to reaffirm the view that the term "property" is subject to expansive interpretation. *See Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *cf. United States v. Santa–Manzano*, 842 F.2d 1, 3 (1st Cir.1988) (a personal release might constitute property for purposes of § 1341; "mail fraud statute's coverage 'is to be interpreted broadly insofar as property rights are concerned.'") (quoting *McNally*, 483 U.S. at 356, 107 S.Ct. at 2880).[11] Carpenter was convicted of wire fraud, for divulging confidential informa-

10. Section 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or know-

ingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

11. Unlike *McNally*, *Carpenter* dealt with convictions under both the mail fraud statute and the wire fraud statute, *see* 18 U.S.C. § 1343. Given their similar language, the Court held the *McNally* rationale applicable to both statutes. *Carpenter*, 484 U.S. at 25 n. 6, 108 S.Ct. at 320 n. 6.

tion belonging to his employer, the Wall Street Journal, in advance of scheduled publication dates. *Carpenter,* 484 U.S. at 23, 108 S.Ct. at 319. *Carpenter* held that, besides being deprived of its intangible right to "honest and faithful service," which *McNally* had held "too ethereal" an interest to come within the mail fraud statute, the Journal had been deprived of "something of value." *Id.* at 25, 27, 108 S.Ct. at 320, 321. The Court pointed out that notwithstanding its "intangible nature" confidential business information traditionally has been treated under state law as a "species of [intangible] property to which the corporation has the exclusive right and benefit." *Id.* at 26, 108 S.Ct. at 320. Although the Journal may have sustained no demonstrated monetary loss from the premature disclosures,[12] the Court decided that the newspaper had "been deprived of its right to exclusive use of the information," an "important aspect" of most property rights. *Id.* at 26–27, 108 S.Ct. at 320–21.

The ramifications of *McNally* and *Carpenter* remain unclear. Some courts of appeals have concluded that the government holds a "property right" in unissued licenses and permits for purposes of the mail and wire fraud statutes. *See, e.g., Borre v. United States,* 940 F.2d 215, 222 (7th Cir.1991) (cable television franchise); *Frank v. United States,* 914 F.2d 828, 833 (7th Cir.1990) (surrendered driver's license); *United States v. Martinez,* 905 F.2d 709, 715 (3d Cir.) (medical license), *cert. denied,* —— U.S. ——, 111 S.Ct. 591, 112

L.Ed.2d 595 (1990); *see also United States v. Turoff,* 701 F.Supp. 981, 991 (E.D.N.Y. 1988) (taxicab medallions); *cf. United States v. Sacco,* 923 F.2d 970, 973 (2d Cir.) (two members of three-judge panel express disagreement with controlling circuit precedent that unissued waste dumpsite permit is not "property"), *reh'g granted on related grounds,* 927 F.2d 726 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991). Other courts of appeals have concluded that unissued licenses and permits are mere regulatory manifestations of the police power which cannot be characterized as property interests under *McNally. See, e.g., United States v. Schwartz,* 924 F.2d 410, 418 (2d Cir.1991) (arms export licenses); *United States v. Granberry,* 908 F.2d 278, 281 (8th Cir.1990) (school bus operating permits); *United States v. Kato,* 878 F.2d 267, 269 (9th Cir. 1989) (FAA pilot licenses); *Toulabi v. United States,* 875 F.2d 122, 126 (7th Cir.1989) (taxi licenses); *United States v. Dadanian,* 856 F.2d 1391, 1392 (9th Cir.1988) (gambling license); *United States v. Evans,* 844 F.2d 36, 42 (2d Cir.1988) (arms export permit); *United States v. Murphy,* 836 F.2d 248, 254 (6th Cir.) (bingo permits), *cert. denied,* 488 U.S. 924, 109 S.Ct. 307, 102 L.Ed.2d 325 (1988). Even though the issue is one of first impression in this circuit,[13] our analysis does not persuade us that *McNally* precluded these convictions.

First, the Court narrowly restricted the *McNally* holding to the intangible right to *honest government.* The Court specifically directed its disapproval at a string of

12. Presumably, the newspaper suffered no pecuniary loss as a result of the premature disclosures since Carpenter did not supply the information to Journal competitors, but directly to investors.

13. Although *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 791 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990), suggested that the defendants' alleged scheme—the obtaining of federal agency approval to issue domestic and international airline tickets—did not deprive the government of "property," the "property" issue was collateral to the disposition of the case. Appellant conceded the issue on appeal, arguing instead that *he* had been defrauded by the defendants' scheme, which resulted in the unilat-

eral termination of his exclusive contract with one of the defendants, the Norton Company. *McEvoy* held that the complaint failed to allege a sufficient causal connection between defendants' racketeering activities and the injury to plaintiff's business, since defendants' fraudulent application to the federal agencies came *one month after* Norton terminated its contract with McEvoy. Thus, whether the federal agencies were defrauded of their "property" was irrelevant to our conclusion that McEvoy's complaint failed to state a civil RICO claim. *See, e.g., Arzuaga–Collazo v. Oriental Fed. Sav. Bank,* 913 F.2d 5, 7 (1st Cir.1990) (RICO complaint insufficient to state "cause-in-fact" link, as plaintiff's injury came *before* alleged predicate acts of bankruptcy fraud).

federal prosecutions which had utilized section 1341 to prosecute corrupt state officials for abusing their positions for purposes of self-dealing, even though the State had refrained from criminalizing their conduct. *But cf.* Mass.Gen.L. ch. 138, § 62 (violation of alcoholic beverage licensing statute punishable by fine or imprisonment). Alluding to the rule of lenity and to serious *federalism* concerns, the Court refused to "construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for state and local officials." *McNally*, 483 U.S. at 360, 107 S.Ct. at 2881. We think the Court's language counsels against extending *McNally* to cases in which the defendants are not government officials, the core conduct has been criminalized under state law, and there are no significant comity concerns about force-feeding federal ethical standards to state and local governments.

■ In addition, given the Court's expansive interpretation of the term "property" in *Carpenter*, and its consistent resort to *state* common law and statutory law defining "property," we believe the municipal government's interest in these alcoholic beverage and entertainment licenses was in the nature of a "property" interest within the meaning of *McNally* and *Carpenter*. In its broadest sense, a "property" interest resides in the holder of any of the elements comprising the "bundle of rights" essential to the use or disposition of tangible property or to the exercise or alienation of an intangible right. *See, e.g., Brotherton v. Cleveland*, 923 F.2d 477, 481 (6th Cir.1991) ("The concept of 'property' in the law is extremely broad and abstract. The legal definition of 'property' most often refers not to a particular physical object, but rather to the ... bundle of rights recognized in that object ... [including] the rights to possess, to use, to exclude, to profit, and to dispose."). For instance, in *Carpenter* the defendant held a possessory interest in the wrongfully-disclosed confidential information, while the Wall Street Journal retained the right to *control* the manner of its use, dissemination, and alienation. Similarly,

the City of Boston had the right to control the issuance of these licenses, in order to assure their issuance to deserving licensees only.

Even if these licenses did not become "property" until their issuance, *see Konstantopoulos v. Town of Whately*, 384 Mass. 123, 424 N.E.2d 210, 217 (1981) (holder of entertainment license has protectable due process interest), the city retained the right to control their alienation by the licensees, a property right analogous to those recognized at common law (fee simple determinable with a possibility of reverter). The licenses were renewable on an annual basis, and defeasible on the occurrence of prescribed contingencies. Under Mass. Gen.L. ch. 138, § 23, "upon the expiration, suspension, revocation, cancellation or forfeiture of such a license or permit [, the Commonwealth] shall be entitled upon demand to the immediate possession thereof." Furthermore, the issued licenses could not be transferred to third parties without the prior approval of the appropriate licensing board. *See* Mass.Gen.L. ch. 138, § 15A; *cf. Evans*, 844 F.2d at 40 ("under some circumstances, the right to control the future alienation and use of a thing is a property right."). Thus, at the very least, defendants repeatedly deprived the City of Boston of its reversionary interest in the fraudulently obtained licenses by renewing and transferring the licenses in the names of straw owners.

Absent any of the serious federalism concerns involved in *McNally*, we are disinclined to extend its sway where a defendant fraudulently deprives a local government of its right effectively to control the issuance of local operating licenses and of its reversionary interests in previously issued licenses.

## C. *Cruel and Unusual Punishment*

■ Bel–Art contends that the judgment of criminal forfeiture relating to property valued at approximately $2.3 million was so "grossly disproportionate" to the seriousness of Bel–Art's criminal involvement in the racketeering enterprise as to amount to "cruel and unusual punishment," or an "ex-

cessive fine," in violation of the Eighth Amendment.[14] *See United States v. Busher*, 817 F.2d 1409, 1415 (9th Cir.1987) (prior to judgment of criminal forfeiture under RICO, Eighth Amendment requires explicit proportionality findings). The district court rejected Bel–Art's motion to delimit the criminal forfeiture in monetary terms.

We bypass the unresolved question whether a corporation may assert an Eighth Amendment claim. *See Browning–Ferris Indus., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257 & n. 22, 109 S.Ct. 2909 & n. 22, 106 L.Ed.2d 219 (1989); *United States v. Pilgrim Market Corp.*, 944 F.2d 14, 22 (1st Cir.1991); *see also Johnson v. Robison*, 415 U.S. 361, 366–67, 94 S.Ct. 1160, 1165–66, 39 L.Ed.2d 389 (1974) (in construing statute, court shall avoid constitutional issues where possible). The required threshold comparison between the gravity of Bel–Art's criminal conduct and the severity of the forfeiture penalty does not support the "initial inference of gross disproportionality" needed for a successful Eighth Amendment challenge. *See Tart v. Commonwealth of Mass.*, 949 F.2d 490, 503 & n. 16 (1st Cir.1991).[15] Without attempting to estimate the actual loss to its victims, Bel–Art bases its entire disproportionality assessment on the bare contention that the value of its forfeited property grossly exceeded the value of the licenses and back taxes of which it deprived the City of Boston and the Commonwealth of Massachusetts. *See United States v. Pryba*, 900 F.2d 748, 757 (4th Cir.) ("Even if we thought a proportional analysis was required, appellants have failed to proffer the information that would be required for such an undertaking."), *cert. denied,* ——

U.S. ——, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990). The *Busher* court itself recognized that bald assertions of this nature are insufficient, noting that such pecuniary discrepancies naturally result from the congressional intendment that criminal forfeitures under RICO are to serve *punitive* rather than compensatory purposes. *Busher*, 817 F.2d at 1415.

Unlike forfeitures effected under section 1963(a)(1), which target properties *derived* from the RICO enterprise, the Bel–Art forfeiture, relating to property "affording a source of influence over a criminal enterprise," 18 U.S.C. § 1963(a)(2)(D), would be warranted only *to the extent* the jury determined the property to have been tainted by the racketeering activity. *See United States v. Angiulo*, 897 F.2d 1169, 1212 (1st Cir.) (explaining proportionality rule in forfeiture proceedings), *cert. denied,* —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990). The jury had ample evidence, none of which was challenged on appeal, from which to infer that the forfeited Bel–Art properties were an indispensable component of defendants' longstanding scheme to deprive the City of Boston of licenses and the Commonwealth of Massachusetts of back taxes. Moreover, the level of taint attaching to Bel–Art's property necessarily depended largely on factual issues resolved adversely to the defendants at their jury trial. Therefore, we conclude that Bel–Art cannot succeed on the showing required to support the "initial inference of gross disproportionality" needed for a successful Eighth Amendment challenge.

### D. *Interest on Forfeiture Proceeds*

Prior to its indictment, Bel–Art entered into a contract to sell the real property

---

**14.** The Eighth Amendment provides: "Excessive bail shall not be required nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const. amend. VIII.

**15.** Bel–Art further contends that the defendants were selectively prosecuted from among the many miscreants who defrauded the City of Boston of licenses. Bel–Art relies on *Busher*, 817 F.2d 1409 (9th Cir.1987), which was premised on the three-part test set out in *Solem v. Helm*, 463 U.S. 277, 290–92, 103 S.Ct. 3001, 3009–11, 77 L.Ed.2d 637 (1983). In addition to a gross disproportionality determination, *Solem*

would require a comparison of the forfeitures imposed for comparable offenses in Massachusetts *and* in other jurisdictions. Recently, however, in a significant curtailment of *Solem*, a majority of the Court favored either dispensing with the *Solem* test in all non-capital cases, or reaching *Solem*'s inter- and intra-jurisdictional analyses only "in the *rare* case in which the threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Harmelin v. Michigan*, —— U.S. ——, ——, 111 S.Ct. 2680, 2707, 115 L.Ed.2d 836 (1991) (emphasis added).

which was subject to forfeiture. The government obtained a pretrial order restraining the sale. Later, Bel–Art and the government agreed to permit these properties to be sold pending trial, and the sale proceeds ($3.1 million) were placed in interest-bearing escrow accounts. The jury returned a proportional verdict of forfeiture pursuant to section 1963(a)(2), and the bulk of the principal and accrued interest remaining in escrow was forfeited to the United States.[16] Bel–Art contends that the government is not entitled to the accrued interest because (1) section 1963(a) fixes the amount of the forfeiture as of the commission of the criminal offense, and (2) the government waived its right to the accrued interest.

### 1. Scope of Section 1963

■ Section 1963(a)(2)(D) declares forfeitable "any property or contractual right of any kind affording a source of influence over any enterprise ... in violation of section 1962." Bel–Art argues that the interest on the escrowed funds is not forfeitable, as it accrued on the lawfully invested sale proceeds. Where a criminal statute is ambiguous, Bel–Art argues, the court should invoke the rule of lenity. *See United States v. Enmons*, 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973).

Bel–Art's contention is foreclosed by section 1963(c), which provides that title to forfeitable property "vests in the United States upon the commission of the act giving rise to forfeiture."[17] Addressing the broader question whether the district court may impose prejudgment interest on the value of *forfeitable* property retained by the defendant during the period between its wrongful acquisition and the judgment of forfeiture, this court stated that

> the RICO forfeiture statute does not expressly provide for the imposition of interest. RICO's provisions, however, were intended to be *liberally construed* to accomplish the statute's objectives. ... The forfeiture provision, in particular, constitutes one of the crucial weapons in the RICO arsenal and should be liberally construed to accomplish its purpose of attacking the economic power of illegal enterprises. ...
>
> ... If interest had not been imposed, the defendants effectively would have been allowed to pocket three years worth of interest earned on a real estate investment that, in large part, was acquired with the proceeds of an extortionate loan.

*Angiulo*, 897 F.2d at 1216 (emphasis added) (citations omitted). Applying the *Angiulo* rationale in the instant context, it is obvious that interest could not have accrued but for the deposit of the proceeds from the sale of the forfeitable properties. No less clearly, title to the forfeitable properties "vest[ed]" in the United States upon the commission of the act giving rise to forfeiture," 18 U.S.C. § 1963(c), and, absent an

**16.** Prior to the forfeiture verdict, the government released its claim to one parcel of real property, and Bel–Art withdrew the sale proceeds and the accrued interest attributable to the sale of the released parcel. With the exception of the proceeds attributable to two "untainted" apartment properties, the remaining principal and interest in the escrow accounts ($2.3 million) was declared forfeit.

**17.** The cases relied on by Bel–Art do not aid its argument. For instance, Bel–Art cites *United States v. Regan*, 699 F.Supp. 36, 38 (S.D.N.Y. 1988), for the proposition that "the penalty imposed by the RICO statute on a defendant's untainted property [is] in the nature of a fine that is *fixed and final* as of the time of the crime." (Emphasis added). There is no indication that the post-offense "accretions" discussed in *Regan* were in the nature of accrued interest. More importantly, the court propounded its

view as to the "fixed" nature of the RICO forfeiture penalty largely without explanation, cited neither the language nor the legislative history of section 1963, and relied on no caselaw. Bel–Art also cites *United States v. Conner*, 752 F.2d 566, 576 (11th Cir.), *cert. denied*, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985), for the proposition that a section 1963 forfeiture penalty is "a money judgment against the defendant for the *same amount* of money which came into his hands illegally in violation of [the statute]." (Emphasis added). Taken in context, however, the quoted language clearly relates to the narrower question whether the government is under an obligation to *trace* specific funds in order to determine where the defendant secreted the tainted monies. The *Conner* court was not confronted with the accrued interest question presented here.

express agreement to the contrary, interest earned on the sale proceeds belongs to the entity entitled to the escrowed principal.[18]

### 2. Escrow Agreement

■ Finally, Bel–Art argues that the government waived its "relation back" rights.[19] Our review of the written agreement authorizing the sale discloses no waiver. In return for the government's agreement to permit the pending sale, Bel–Art agreed that "the proceeds of the sale ... *shall be treated as the property from which they were derived for all purposes* under [section 1963]." (Emphasis added). Bel–Art's waiver contention depends entirely on the premise that the agreement is *silent* on the issue of accrued interest.[20] Given the presumptive rights of the United States under section 1963(c), as well as the express terms of the agreement permitting the sale, Bel–Art's contention fails.

*Affirmed.*

---

**18.** Bel–Art would distinguish *Angiulo* on the ground that it involved a forfeiture under § 1963(a)(1), not § 1963(a)(2), but cites no authority for the attempted distinction. *Cf. Angiulo,* 897 at 1210 (defendant's proposition, that § 1963 treats (a)(1) forfeitures as *in personam* actions and (a)(2) forfeitures as *in rem* actions, unsupported by authority). The unqualified language of the "relation back" provision in § 1963(c) intimates no such distinction.

**19.** Bel–Art relies on *United States v. Kingsley,* 851 F.2d 16, 21 (1st Cir.1988) (defendant entitled to interest earned on assets previously subject to forfeiture where government breached implied promise to place funds in interest-bearing account). *Kingsley* is readily distinguishable. There the government was estopped from invoking its "relation back" rights because it deliberately disregarded a court order to invest forfeitable assets during the period prior to forfeiture and the defendant reasonably relied on the government's implied representation in entering into a plea agreement. *See id.* There was no such representation by the government in the present case.

**20.** For example, Bel–Art cites paragraph (e) of the agreement, which provides for Bel–Art's transfer of the "proceeds of the sale," not the proceeds *plus interest,* in the event the co-escrowee is unavailable following a verdict of forfeiture. Since we are required to interpret the agreement as a whole, however, giving weight where possible to all of its provisions, *see Spartans Indus., Inc. v. John Pilling Shoe Co.,* 385 F.2d 495, 499 (1st Cir.1967), Bel–Art cannot avoid the purport of the broad language of paragraph (c) ("proceeds of the sale ... shall be treated as the property from which they were derived....").