United States v. McMullin                05-CR-142-SM 07/18/06
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


United States of America

      v.                              Criminal No. 05-cr-142-01-SM
                                      Opinion No. 2006 DNH 082
Donald McMullin


                            **O R D E R**


      Defendant moved to suppress physical evidence, and

subsequent incriminatory statements he made to police, on grounds

that the search of his home that led to the discovery of that

evidence, and which prompted his statements, was

unconstitutional.  He argues that the warrant authorizing the

search was not supported by probable cause and that the good

faith exception to the exclusionary rule, established in United

States v. Leon, 468 U.S. 897 (1984), is inapplicable under the

circumstances.  An evidentiary hearing was held and, for the

following reasons, the motion to suppress (document no. 14) and

supplemental motion to suppress (document no. 23) are denied.



                          **Background**

      Although the eventual criminal charges brought against the

defendant related to his unlawful possession of drugs and

firearms, this case began as an investigation into the poisoning, or attempted poisoning, of his neighbor's well.

On November 17, 2004, New Hampshire District Judge Pamela Albee issued a warrant authorizing a search of defendant's home and property based upon an application and supporting affidavit filed by Sergeant Mark O'Brien of the Wakefield Police Department. Sergeant O'Brien's affidavit informed the judge that James Fitzpatrick, defendant's next door neighbor, had filed a complaint with the New Hampshire Department of Environmental Services ("DES"), stating that the well providing his home with water had been contaminated by the deliberate introduction of the chemical pesticide Diazinon, and that he believed the defendant had done it.

At Fitzpatrick's request, the DES tested material obtained from his well and from plumbing fixtures in the home, as well as a water sample from the well, and found Diazinon to be present.[1]

---

[1] Defense counsel says, and repeats, in his pleadings, that two water samples were submitted to DES and that the first "tested negative for Diazinon," implying that the well had not in fact been contaminated. But the record is clear that the first submitted sample was not tested for Diazinon. At the end of the plea colloquy on June 21, 2006, defense counsel agreed that if the first sample was not tested for the presence of Diazinon it would be incorrect to suggest that the sample "tested negative" for that substance, and that results of testing for other chemicals on that sample are entirely irrelevant to any issue

2

DES referred the matter to New Hampshire's Attorney General, and the Attorney General, in turn, referred it to the Wakefield Police Department, noting that her office would no longer be investigating the matter.[2]

Sergeant O'Brien followed up on the Attorney General's referral by conducting an investigation. His affidavit related that he began by interviewing Fitzpatrick. Fitzpatrick told O'Brien that in August of 2004 he noticed that water pressure in his home was getting low, so he called a plumber to check the system. Fitzpatrick identified the plumber by name, Arnold Lord, and said Lord found brown material on faucet and shower fixtures in the home. Fitzpatrick said the plumber then removed the well pump (which was 147 feet below the surface) and found that a granular substance was stuck in and clogging it. Fitzpatrick told O'Brien that he had the particulate matter tested by DES and it was found to contain Diazinon, a chemical pesticide. Fitzpatrick gave O'Brien the granular substance removed from the well. O'Brien also noted that DES testing disclosed that, as of

pending here.

[2] Defense counsel characterizes the referral as the Attorney General's having "declined to prosecute," implying that the complaint was deemed to be without merit, or was of insufficient merit to warrant enforcement action, which seems an overstatement.

the time of testing, the pesticide had dissolved sufficiently to be present in the water sample at levels of 4 parts per billion. According to the warrant application, the accepted safe levels in drinking water is less than 6 parts per billion.

Sergeant O'Brien examined the well location, finding it to be half way down the driveway, close to the boundary of defendant's driveway, separated by a few trees. Fitzpatrick told O'Brien that the plumber checked the well cover and found that the bolts showed no sign of tampering, but the well cap had a threaded breather cap that can be unscrewed, opening a 2-3 inch diameter hole directly into the well. Fitzpatrick also told O'Brien that the previous owner of his property, identified as Frank Covie, had been in a dispute with defendant over the purchase of the property, and that Covie, too, found the well contaminated, with dead fish.

Water samples were taken by O'Brien from the filter on the main well pipe, and from the faucet at the kitchen sink. Those samples, and the granular substance provided by Fitzpatrick, were brought to the DES by O'Brien to be examined, but the affidavit does not refer to any additional test results.

O'Brien also related, presumably based upon his investigation, that Diazinon is a pesticide that exists in several forms, has a low presence in soil, with a half-life of 2-4 weeks, and seldom migrates past the first ½ inch of topsoil.

O'Brien informed the judge that Fitzpatrick believed defendant put the Diazinon in his well because they had a history of disputes, court cases were pending in which Fitzpatrick was a potential witness against defendant, and defendant could easily access the well from his own property. O'Brien checked the records of the Wakefield Police Department and found a number of reports "between Mr. Fitzpatrick and Mr. McMullin,"[3] confirming that indeed there was an acrimonious relationship of long-standing duration. O'Brien summarized the reports in short-hand fashion, giving the police incident number, the date, and a short statement of the jist of the complaint at issue. Some twenty-two reports were referenced, eighteen of which seem to have been complaints by Fitzpatrick and four by defendant.

---

[3] Defense counsel argues that defendant did not know about some of the complaints made by Fitzpatrick related to him, and so could not have been motivated to retaliate, at least not based upon those specific complaints. The summary of reports did, however, plainly disclose a rather continuous state of animosity between both men.

5

O'Brien also related that defendant "has numerous complaints and problems with the other neighbors on the road" and that two civil lawsuits involving defendant were pending in which Fitzpatrick was a potential witness – one involving the Town of Wakefield, and one the Crew Road Association, alleging road damage by defendant (defendant lives on Crew Road), as well as a criminal matter in which allegations of vandalism to Crew Road were brought against defendant. Fitzpatrick was expected to be a witness in the criminal case as well. Judge Albee, the issuing judge, noted that O'Brien also supplemented his affidavit by adding that the well was located approximately 300 – 350 feet down the Fitzpatrick driveway, on the edge of the defendant's driveway, giving defendant access to the well.

The warrant was executed by Lieutenant Kenneth Fifield. Lieutenant Fifield told defendant that he had a search warrant, explained the nature of the investigation, and described the items police would be looking for. Defendant volunteered that he had a bag of Diazinon in his shed, but said it was unopened. Lieutenant Fifield, noting that the material in Fitzpatrick's well could not have come from an unopened bag, explained that a full search would be conducted, beginning with the residence, presumably for receipts or other indicia of purchase.

Defendant was asked if he had any receipts for the Diazinon. He said he kept receipts but did not think he could find them. A searching officer found a loaded AR-15 rifle in a kitchen closet, and, after a cursory search of the first floor, the search team moved to the basement, where a weighing scale and a glassine baggy containing what appeared to be marijuana were seen. The search was stopped while the police sought to enlarge the scope of the warrant. The court twice enlarged the scope and the subsequent searches led to the discovery of the multiple firearms and drugs supporting the charges pending now. Defendant only challenges the initial search warrant.

The Search Warrant

"For evidence to avert suppression, normally the warrant application must demonstrate probable cause to believe that a particular person has committed a crime – 'the commission element' – and that enumerated evidence relevant to the probable criminality likely is located at the place to be searched – 'the "nexus" element.'" United States v. Zayas-Diaz, 95 F.3d 105, 110-111 (1st Cir. 1996)(citations omitted). To meet the probable cause standard, the "totality of the circumstances" disclosed in the supporting affidavit(s) and exhibit(s) must establish a "fair probability that contraband or evidence of a crime will be found

in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).

"Reviewing courts, including both the district court and the court of appeals, must accord 'considerable deference' to the 'probable cause' determination made by the issuing magistrate." Zayas-Diaz, at 111 (citing United States v. Taylor, 985 F.2d 3, 5 (1st Cir. 1993) ("[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed.")). Moreover, the reviewing court must examine "the affidavit in 'a practical, "common sense" fashion, and [ ] accord considerable deference to reasonable inferences [the issuing] magistrate may have drawn from the attested facts.'" Id. (citing United States v. Bucuvalas, 970 F.2d 937, 940 (1st Cir. 1992)). And, "given the strong preference for warrants under our Fourth Amendment jurisprudence, normally a reviewing court will defer to an issuing magistrate's 'probable cause' determination in a doubtful or marginal case." Id. (citing United States v. Ventresca, 380 U.S. 102, 109 (1965); United States v. Craig, 861 F.2d 818, 823 (5th Cir. 1988)).

Considering all of the circumstances as presented, Judge Albee determined that a fair probability existed that evidence of

8

the apparent poisoning of Fitzpatrick's well (e.g., chemicals containing Diazinon, pesticides, lawn care products, receipts and evidence of purchase of same) would likely be found on defendant's premises. See Illinois v. Gates, 462 U.S. at 238-39. Defendant challenges that finding.

This was arguably a marginal case, and Judge Albee fully recognized that fact. She noted that the evidence supporting the warrant application was "circumstantial" in nature when she issued the warrant. But, it is also a case in which the issuing magistrate could have drawn reasonable inferences from the attested facts sufficient to support a probable cause determination, and, in any event, sufficient to satisfy this court that she had a substantial basis upon which to conclude that probable cause existed.

Based upon the affidavit and supporting exhibits filed by O'Brien, Judge Albee determined that: "Given the level of animosity between Fitzpatrick and [defendant], and the fact that Fitzpatrick is a witness in pending cases against [defendant], [defendant] can be said to have motive as well. Although the evidence is circumstantial, the court finds a sufficient basis to support probable cause to issue a search warrant of [defendant's] property, vehicles, sheds and other out buildings and curtilage."

9

Judge Albee found sufficient evidence to believe that crimes probably had been committed, (i.e., attempted second degree assault and criminal mischief), and that evidence of those crimes "may be found at the Residence, Curtilage, Outside containers, trailers, and Vehicles, and or Trailer/Containers located at the [defendant's] residence at 441 Crew Road in Wakefield, New Hampshire." She authorized a search of the premises for "chemicals containing Diazinon including pesticides, insecticides, lawn care products, granular, pellet, and pow[d]er or liquid or receipts and documentation of purchase of the same." See Search Warrant dated November 17, 2004.

First, it was apparent that Fitzpatrick's well had been intentionally contaminated with the pesticide Diazinon. The affidavit and exhibits disclosed that the chemical is not naturally occurring, would not penetrate through the ground to the level of the well by natural means, and yet it was found in the filter of the well pump in granular form, as well as in faucets and a shower head in the home. It was discovered by a third party – a plumber called in to investigate low water pressure – and the contaminant and water sample tested positive for the chemical. Those tests were conducted by a state agency. Necessarily, then, Diazinon was intentionally put into the well

10

by someone, likely through the breather cap opening on the well cover.  That act was unarguably criminal in nature.[4]

Second, putting aside the implausible "Fitzpatrick might have done it to himself" theory implied by defendant, and considering the totality of the circumstances, the most likely suspect was plainly the defendant.  He had a motive.  The near-continuous past history of animosity toward, and confrontations with Fitzpatrick demonstrated that defendant did not like Fitzpatrick and was not above deliberately causing him problems (e.g., running his truck and other vehicles in a manner that caused fumes to blow into Fitzpatrick's home, seemingly intentionally).  See Defendant's Hearing Exhibit X.  Fitzpatrick described the ongoing problems with defendant to Sergeant O'Brien, and O'Brien confirmed the antagonistic relationship when he reviewed the Wakefield Police Department records, which he summarized for the judge.

---

[4] Defendant seems to imply that Fitzpatrick could be completely fabricating, and in fact could have put the Diazinon in his own well.  That would be one, but not the most likely, explanation for the Diazinon's presence in the well and home water system.  But Fitzpatrick's family also lived in the home, so even if he poisoned his own well, the act would still constitute a crime.

Defense counsel says that some of Fitzpatrick's complaints were not meritorious, or the problems were not tied to the defendant, and that the relationship had not been all that antagonistic for some time. But the police records confirmed Fitzpatrick's appraisal in the main, and both the police and issuing judge had no reason to seriously doubt Fitzpatrick's description of the relationship as having been continuously antagonistic. The point here is not, of course, which neighbor was in the right all or most of the time with respect to the complaints made. The point is that Fitzpatrick reported that strong ill-feeling existed, and many confrontational incidents occurred, between them on a fairly regular basis over the years, and that the police department's records supported that assessment.

Defendant also reportedly did not get along with many others in town. The town and a local association were involved in litigation with defendant over damage he allegedly caused Crew Road, the road in front of his house. Fitzpatrick was a potential witness against defendant in that civil litigation, as well as in a criminal prosecution against defendant for alleged vandalism to Crew Road. And, Fitzpatrick related that the previous owner of his home also had a difficult relationship with defendant, and he also found his well contaminated – in that case

12

with dead fish (also unlikely to find their way into a well by natural means).

Third, defendant not only had a motive, but he also had the best opportunity to put Diazinon in Fitzpatrick's well. Sergeant O'Brien's investigation revealed that the well was located near the boundary line between Fitzpatrick's and defendant's property, along the driveway, about 300-350 feet from the road. Defendant was presumably familiar with his boundary and the well's location relative to it, and he had ready access to the well from his own property at any time, night or day. While others may also have known where the well was located, and possibly could have gained undetected access to it, the person best-positioned to do so was the defendant.

All in all, while more might have been done to develop facts in support of the warrant application, still, motive and opportunity, under these circumstances, provided Judge Albee with at least a "substantial basis for concluding that probable cause existed" to believe that evidence of the crime would likely be found on defendant's premises. It was not unreasonable for her to determine that a crime was committed, and to infer that defendant committed it, and, therefore, that he would likely possess pesticides containing Diazinon identical to those found

13

in the well.  Pesticides containing Diazinon are the kind of materials likely to be found in a garage, shed, basement, home, etc., and, given the relatively small amounts found in the well, more was likely to have been in the possession of the perpetrator (pesticides usually come in volumes larger than the amounts that were found in the well, and are usually used completely or stored for quite some time).

Concededly, the probable cause determination made by Judge Albee depended on inferences drawn from the facts disclosed, as well as her recognition that defendant had both a motive and the opportunity to contaminate Fitzpatrick's well.  "Motive and opportunity" are concepts that, under some circumstances, strongly point to a particular person and place, but, under others, only weakly.  See e.g., Nugent v. Hayes, 88 F. Supp. 2d 862 (N.D. Ill. 2000); Kaltner v. Pebbles, 628 F. Supp. 96 (E.D. Mich. 1986).  Here, reasonable jurists might well have determined that, at best, the affidavit and exhibits supporting the warrant application raised only a solid suspicion that defendant might have had something to do with the contamination.  But, as noted above, this court's obligation is not to redetermine probable cause de novo, but to ensure that the issuing magistrate had a substantial basis for concluding that probable cause existed. According considerable deference to the reasonable inferences

14

Judge Albee could have drawn from the facts presented, and granting that this was a close call, still, she had a substantial basis for concluding that probable cause existed to believe that defendant contaminated Fitzpatrick's well with Diazinon. And, it follows that if he did contaminate the well, a fair probability existed that the pesticide he used would still be found in his possession at his property.

The Leon Good Faith Exception

In any event, while reasonable jurists might disagree about whether probable cause to search was established, and even about whether Judge Albee "had a substantial basis" for so concluding, the defendant's suppression motion must also be denied on other, perhaps more solid, grounds – the good faith exception described in United States v. Leon, 468 U.S. 897 (1984). In Leon the Supreme Court recognized a "good faith" exception to the exclusionary rule, holding that when police obtain evidence in good faith reliance upon a search warrant that subsequently is found to be deficient, that evidence still may be used in a criminal trial. As the court explained, the exclusionary rule is intended as a deterrent designed to ensure compliance with the Fourth Amendment. The deterrent is aimed at police, not neutral and detached magistrates. Generally, when police seek, obtain, and rely upon a warrant issued by a neutral and detached

15

magistrate, "there is no police illegality and thus nothing to deter." Leon, at 921.

The Leon rule does not apply, however, in the absence of good faith. That is, where a law enforcement officer had knowledge, or may be charged with knowledge, that the search was unconstitutional under the Fourth Amendment, the Leon exception does not apply. Id. at 919. Here, defendant says the warrant application and supporting affidavit are, in effect, "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," notwithstanding issuance of the warrant. Id. at 923.

As noted above, other judges may have concluded differently than Judge Albee, finding that the application and supporting affidavit provided a solid basis for suspecting defendant, but not quite enough to establish probable cause to believe he put the Diazinon in Fitzpatrick's well (and, therefore, that the remaining pesticide would likely be found on his property). But the issue is a fairly debatable one, and Leon "[favors] non-exclusion in situations where the warrant is based on 'evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause.'" United States v.

16

<u>Ricciardelli</u>, 998 F.2d 8, 15 (1st Cir. 1993) (citing <u>Leon</u>, at 926).

The <u>Leon</u> good faith exception applies here. Police officers conducting the search of defendant's home and property reasonably relied upon the warrant issued by Judge Albee, and Sergeant O'Brien's supporting affidavit had ample indicia of probable cause "'to render official belief in its existence'" reasonable. <u>Leon</u>, at 923 (quoting <u>Brown v. Illinois</u>, 422 U.S. 590, 610-11 (1975)). Lawyers and judges might legitimately debate the matter, but the police officers involved had no reason to think the warrant plainly defective.

Of course, police also may not rely on a search warrant under <u>Leon</u> if the issuing magistrate was misled by information in a supporting affidavit that the affiant knew was false, or would have known was false except for his or her reckless disregard of the truth. <u>Leon</u>, at 924. In <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), the Supreme Court recognized a strong presumption of validity with respect to affidavits supporting search warrants, but allowed criminal defendants to challenge that validity upon showing that a false statement, knowingly and intentionally made, or made with reckless disregard for the truth, was included in

17

the affidavit, and, that the false statement was essential to the finding of probable cause.

"The Franks test also applies when affiants omit material facts 'with the intent to make, or in reckless disregard of whether they thereby made the affidavit misleading.'" United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990) (quoting United States v. Reivich, 793 F.2d 957, 961 (8th Cir. 1986)). Obviously, where material facts are intentionally or recklessly omitted from the affidavit, and those facts, if included, would have precluded the probable cause finding, "good faith" under Leon could not be found. See e.g., United States v. Vigeant, 176 F.3d 565 (1st Cir. 1999).

Here, defendant says that Sergeant O'Brien intentionally omitted material facts from his affidavit that necessarily affected Judge Albee's probable cause determination. He complains that O'Brien should have included all of the police reports related to the numerous incidents between him and Fitzpatrick, rather than just providing short summaries of each complaint or incident. Perhaps that additional information may have been useful in determining whether Fitzpatrick was likely fabricating the entire incident, but nothing in this record suggests that O'Brien intentionally omitted the reports in order

18

to mislead the judge into finding probable cause when there was none, or where he thought there might have been a serious question. O'Brien, rightly or wrongly, was convinced that probable cause existed. O'Brien's summaries were accurate and, more to the point, the information was provided as corroboration of the fact that these two men did have an ongoing antagonistic relationship, as Fitzpatrick claimed, and that fact was relevant to motive. As the prosecutor points out, additional detail from the reports themselves would have, if anything, strengthened, not undermined, the proposition that defendant had a motive for contaminating Fitzpatrick's well.

To the extent the police reports, if analyzed in terms of who was right and who wrong on particular occasions, might reflect negatively on Fitzpatrick's credibility, as defense counsel argues, they were not particularly significant, and would not have affected the probable cause determination. That Fitzpatrick sometimes complained about defendant over trivial matters, or was wrong, or defendant wasn't aware of a specific complaint, would not have altered the "motive and opportunity" analysis that Judge Albee performed. Besides, nothing in this record suggests that O'Brien either intentionally, or with reckless disregard for the truth, omitted the actual reports in

19

favor of summaries of their contents, for the purpose of manipulating the probable cause finding.

Defendant has failed to make the requisite showing entitling him to a <u>Franks</u> hearing, and, to the extent he obtained one <u>de facto</u>, he has not established that any material omission was made by O'Brien, and certainly none intentionally, or with reckless disregard for the truth. Nor has defendant shown that if the alleged omissions had been included, the probable cause finding would be undermined. Accordingly, the police were entitled to rely upon the warrant, and suppressing the evidence obtained during the search would not have a substantial deterrent effect on the police.

<u>Scope of the Search</u>

Defendant claims the initial search exceeded the scope authorized by the warrant in that the warrant limited the search to "[defendant's] property, vehicles, sheds, and other out buildings and curtilage," and, therefore, did not authorize a search of his home. Defendant acknowledges that a warrant authorizing a search of "premises" includes the authority to search buildings on the identified land. <u>See</u> <u>United States v. Bonner</u>, 808 F.2d 864, 868 (1st Cir. 1986).

20

Defendant misreads the warrant.  The search warrant (Government's Exhibit 1) identified the items to be searched for, recited that the specified evidence may be found "at the Residence, Curtilage, Outside containers, Trailers, and Vehicles, and or Trailer/Containers located at the [defendant's] residence," and specifically identified the places to be searched:

> [Evidence] may be found in the possession of [the defendant] at premises located at: 441 Crew Road Wakefield, including curtilage, outside containers, storage units and, vehicles [.] We Therefore command you . . . to make an immediate search of: [The defendant's] property located at 441 Crew Road, including curtilage, outside containers, storage units, and vehicles [.]

Search Warrant, Government's Exhibit 1 (emphasis supplied).


Here the term "Residence," and both the terms "premises" and "property" were used to designate the place where evidence may be found, and the places to be searched, which terms are essentially synonymous and adequate to include the defendant's house (which was plainly intended).  See Bonner, supra.


## Conclusion

The Motion to Suppress (document no. 14) and amended Motion to Suppress (document no. 23) are denied.

**SO ORDERED.**

_Steven J. McAuliffe_
Steven J. McAuliffe
Chief Judge

July 18, 2006

cc:  Debra M. Walsh, Esq.
     Jonathan R. Saxe, Esq.
     U.S. Probation