United States Court of Appeals,

Eleventh Circuit.

No. 96-6634.

UNITED STATES of America, Plaintiff-Appellee,

v.

Jesse Woodrow SHOTTS, Defendant-Appellant.

July 10, 1998.

Appeal from the United States District Court for the Northern District of Alabama. (No. CR-95-PT-310-S), Robert B. Propst, Judge.

Before BLACK, Circuit Judge, and HILL and HENDERSON, Senior Circuit Judges.

HILL, Senior Circuit Judge:

Jessee W. Shotts appeals his convictions and sentences on various counts of mail fraud and obstruction of justice. For the following reasons, we affirm in part and reverse in part.

I.

Jessee W. Shotts is a criminal defense attorney in Birmingham, Alabama. In the 1980's, he also ran a bail bond business called J & J Bonding Co. In 1990, the Alabama Supreme Court promulgated a rule that prohibited attorneys from having an interest in a bail bond business. Shotts closed J & J Bonding Co., and a new corporation called JC Bail Bonds, Inc. ("JC") was formed. Shotts' wife, Jerri Grant, was the sole shareholder. Subsequently, she transferred her shares to Donald Long, who later transferred his shares to David Pettus. At no time did Shotts own any stock in JC.

Shotts directed his secretary, Kandy Kennedy, to mail applications and money to various municipalities to obtain licenses for the business. These applications named Long as the owner of

the business. Shotts also directed Kennedy to prepare the annual certification, which stated that Long was the owner of the company and that no lawyer had any interest in the company.

The new firm began to operate in the fall of 1990. On three occasions, Shotts took Long to Judge Jack Montgomery's house. Montgomery was a state district court judge in Birmingham. On each occasion, Shotts would go into Judge Montgomery's house alone and return with bonds signed by Montgomery, but otherwise blank. Shotts referred to these pre-approved bonds as "Jack" bonds. They were used as appearance bonds by JC, but without showing JC as the surety. If the defendant did not appear in court as required, JC had no liability on the bond.

In 1992, the Federal Bureau of Investigation (FBI) began an investigation into allegations of corruption on the part of Judge Montgomery and obtained a wire tap of his home phone. In late 1992, the FBI intercepted a phone call from Shotts to Judge Montgomery in which Shotts asked him to sign a bond for a prisoner in another county. When Montgomery responded that he didn't know if he could sign the bond because he had no jurisdiction in that county, Shotts said he "had 5,000 reasons to try." Montgomery then told Shotts to come to his house.

That evening, the FBI executed a search warrant on Judge Montgomery's house. They found $31,000 in the house. The next day, Montgomery resigned from office.[1]

After the search of Montgomery's house, Shotts was called to testify before a grand jury investigating Montgomery. He was asked whether he owned JC Bail Bonds, Inc. He answered that he did not. He was also asked whether he had any interest in or was associated with a bail bond business, but he invoked his Fifth Amendment privilege and refused to answer.

---

[1]Montgomery was subsequently indicted and pled guilty, but was killed by a gunshot before he was sentenced. This case, however, concerns only allegations of mail fraud, perjury and obstruction of justice.

2

In November of 1995, Shotts was indicted and charged with conspiracy to commit mail fraud in violation of 18 U.S.C. § 371 (Count 1) and fifteen counts of substantive mail fraud, in violation of 18 U.S.C. § 1341 (Counts 2-16). The indictment also charged five counts of bribery (of Montgomery) in violation of 18 U.S.C. § 666 (Counts 17-21), and six counts of obstruction of justice—one charging that Shotts made false statements to the grand jury in violation of 18 U.S.C. § 1623 (Count 26) and the remainder based upon witness tampering (Counts 22, 23, 24, 25 and 27), in violation of 18 U.S.C. § 1512. On February 23, 1996, a jury convicted Shotts on Counts 1-16, conspiracy to commit mail fraud and mail fraud, and three of the obstruction of justice counts.[2]

Shotts appeals each of his convictions. He challenges the legal sufficiency of the mail fraud counts and the constitutionality of the obstruction of justice counts. He also contends that the evidence was insufficient to convict him on any of the obstruction of justice counts. Finally, he asserts errors in his sentences.

## II.

Shotts claims that Counts 1-17 must be reversed because the allegations of mail fraud are insufficient as a matter of law. The mail fraud statute prohibits the use of the mails in furtherance of "a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. In *McNally v. United States,* 483 U.S. 350, 360, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court rejected the government's argument that the statute protects intangible rights, and held that the government must allege and prove that the victim was deprived of money or property. Shortly thereafter, the Court further

---

[2]The court dismissed Counts 23 and 27 upon the government's motion, and Count 25 upon motion for acquittal. The jury acquitted Shotts of Counts 17-21.

explained that the statute extends to *intangible* property, but reiterated that Section 1341 is "limited in scope to the protection of property rights." *Carpenter v. United States,* 484 U.S. 19, 26-27, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (citing *McNally,* 483 U.S. at 360, 107 S.Ct. 2875).

Shotts was charged in Count 1 with conspiracy to commit mail fraud. The indictment alleges that "[i]t was a part of the conspiracy that the defendant and his co-conspirators would ... cause to be delivered by mail ... business licenses, license renewal notices, [and] payments for licenses...." Counts 2-17 allege substantive violations of mail fraud and charge that "[i]t was a part of the scheme that the business and the defendant's nominees and agents would then obtain and renew licenses from various municipalities to do business as professional bondsmen." All of the substantive mail fraud counts allege either the mailing of a bail bond license renewal notice with a check or the receipt back in the mail of the license itself.

The government's theory was that these business licenses were property as contemplated by *McNally* and *Carpenter.* During the trial, the government argued that the business licenses were property. The government requested and the court instructed the jury that "[a] business license may be considered property." Therefore, Shotts' convictions for mail fraud and conspiracy to commit mail fraud may be affirmed only if the licenses he obtained were "property" under Section 1341.[3]

---

[3]The government argues that, because the indictment also alleges that part of the scheme was to obtain money, Shotts' conviction may stand even if these licenses are not property under Section 1341, relying on *United States v. Range,* 94 F.3d 614 (11th Cir.1996). Even if *Range* were applicable, we could affirm Shotts' conviction only if we were able to determine with "absolute certainty" that the jury found that one of the purposes of the scheme was to obtain money. *Id.* at 620 (quoting *United States v. Miller,* 84 F.3d 1244, 1257 (10th Cir.1996)). The government concedes, however, that in this case there is a "problem" in determining what the jury found because its verdict was a general one. The government argues that this problem is overcome because "it is evident from a reading of the indictment that the *main* purpose of the scheme was to obtain money." (emphasis added). No authority is cited for the proposition that, if the "main" purpose of a scheme is to obtain money, we can be assured the jury found the

4

We review *de novo* a challenge to the legal sufficiency of the indictment. *United States v. Shenberg,* 89 F.3d 1461, 1478 (11th Cir.1996).

This is an issue of first impression in this circuit and one on which the other circuits are divided. The majority of the circuits have held that a business license is *not* property and cannot support a Section 1341 mail fraud conviction. *See e.g., United States v. Schwartz,* 924 F.2d 410 (2d Cir.1991) (export license); *United States v. Granberry,* 908 F.2d 278 (8th Cir.1990) (school bus driver permits); *Toulabi v. United States,* 875 F.2d 122 (7th Cir.1989) (taxi operator license); *United States v. Kato,* 878 F.2d 267 (9th Cir.1989) (private pilot license); *United States v. Murphy,* 836 F.2d 248 (6th Cir.1988) (license to conduct bingo game). Most of these courts have reasoned that a business license represents nothing more than an "expression of the government's regulatory imprimatur." *Schwartz,* 924 F.2d at 418. For example, the Second Circuit held that "[t]he government's power to regulate does not *a fortiori* endow it with a property interest in the license." *Id.* at 417.[4] On the other hand, some circuits have held that a business license is sufficient property to support a mail fraud conviction. *United States v. Salvatore,* 110 F.3d 1131,1140 (5th Cir.1997) (video poker license); *United States v. Bucuvalas,* 970 F.2d 937 (1st Cir.1992) (liquor license); *United States v. Martinez,* 905 F.2d 709 (3d Cir.1990) (medical license).

---

defendant guilty of seeking to accomplish it. Nor do we think there is any such authority. A general verdict which may rest upon an insufficient legal theory must be reversed. *Griffin v. United States,* 502 U.S. 46, 57, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991); *United States v. Martinez,* 14 F.3d 543, 553 (11th Cir.1994).

[4]Many of these courts imply that a license may be some form of property in the hands of the licensee if the license may not be revoked without due process of law. *See, e.g., Murphy,* 836 F.2d at 253; *Granberry,* 908 F.2d at 279; *Kato,* 878 F.2d at 269; *Ferrara,* 701 F.Supp. at 41.

5

This division among the circuits is not surprising since neither *McNally* nor *Carpenter* define the "property" protected by the mail fraud statute. Both merely teach that the term is "to be interpreted broadly," *McNally,* 483 U.S. at 356, 107 S.Ct. 2875, but not so broadly as to include "intangible rights." *Carpenter,* 484 U.S. at 25, 108 S.Ct. 316.

In *Carpenter,* however, the Supreme Court relied upon two of its prior opinions to hold that confidential business information is property. *Id.* at 26, 108 S.Ct. 316 (citing *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1001-1004, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) and *Dirks v. S.E.C.,* 463 U.S. 646, 653 n. 10, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983)). Both of these opinions relied exclusively upon state law to define property. In *Monsanto,* the Court noted the "basic axiom that "[p]roperty interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' " 467 U.S. at 1001, 104 S.Ct. 2862 (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972))).

Three years later, in considering whether a cable television franchise is Section 1341 property, the Seventh Circuit held that, under *Carpenter,* it must look for the answer in state law. *Borre v. United States,* 940 F.2d 215, 219 (7th Cir.1991) ("It is logical, therefore, for this court to look to state law in determining whether a cable television franchise constitutes "property' for purposes of the mail fraud statute"). The First Circuit agrees. *Bucuvalas,* 970 F.2d at 944 (noting the Supreme Court's "consistent resort to state common law and statutory law defining "property' "). Two of the three circuits which have since held business licenses to be property have located that definition in state law. *Salvatore,* 110 F.3d at 1139 (Louisiana's interest in video poker license

6

defined by its Video Poker Law); *Bucuvalas,* 970 F.2d at 944 (liquor license is property under both Massachusetts statutory and common law).[5] We too have implied in dicta that state law defines property for Section 1341 purposes. *United States v. Italiano,* 894 F.2d 1280, 1285 n. 6 (11th Cir.1990) ("franchises are considered property both generally and under Florida law").

Resort to state law has, not surprisingly, led to directly conflicting results. For example, in the Third Circuit under *Martinez,* fraud in connection with a mailed application for a medical license is a federal crime. In the First Circuit, on the other hand, such a prosecution apparently would be dismissed for failure to state an offense. *United States v. Ferrara,* 701 F.Supp. 39 (E.D.N.Y.) (mail fraud prosecution dismissed because state has no property interest in medical license), *aff'd without opinion,* 868 F.2d 1268 (1988). Similarly, one commits mail fraud in the Fifth Circuit if false statements are made in connection with a mailed application for a gambling license, *Salvatore,* but not in the Ninth Circuit. *United States v. Dadanian,* 856 F.2d 1391 (9th Cir.1988) (scheme to obtain gambling license did not affect government's interest as a property holder). Fraud in a liquor license application sustains a mail fraud conviction in the First Circuit, *Bucuvalas,* but apparently not in the Eleventh Circuit. *Arrington v. Dickerson,* 915 F.Supp. 1503, 1509 (M.D.Ala.1995) (liquor license not property of any sort in Alabama).

These inconsistencies are the result of differences in state-created property interests. What one state regards as property may not be so recognized in another.[6]

---

[5]The only other circuit to hold a license to be property located that interest in federal decisional law. *Martinez,* 905 F.2d at 714-15 (medical license).

[6]For this reason, conflicting definitions of mail fraud *among* the various circuits may well be aggravated by conflicting definitions of mail fraud *within* a circuit. Whether mail fraud is committed in Texas for the mailing of a fraudulent application for a video poker license (if they had video poker) would seem to depend upon whether Texas law creates a property interest in

7

Furthermore, the split in the circuits on this issue is due not only to differences in state law, but to differences in the licenses under review. "A state's property interest in its licenses derives at least in part from the character of the licenses themselves." S*alvatore,* 110 F.3d at 1141. A particular license may signify nothing more than an intent to regulate, while another type of license may signify the state's intent to participate in that industry. *Id.* ("video poker licenses are different than other types of licenses"). A license to drive a taxi, *see Toulabi,* 875 F.2d at 124, may not be a property interest in any state; a medical license may be considered property in most states. *Martinez,* 905 F.2d at 715 (Pennsylvania); *Medical Ass'n of State of Alabama v. Shoemake,* 656 So.2d 863, 867 (Ala.Civ.App.1995); *Lowe v. Scott,* 959 F.2d 323, 334 (1st Cir.1992) (Rhode Island); *Mishler v. Nevada State Bd. of Medical Examiners,* 896 F.2d 408, 409 (9th Cir.1990) (Nevada); *Watts v. Burkhart,* 854 F.2d 839, 842 (6th Cir.1988) (Tennessee); *Keney v. Derbyshire,* 718 F.2d 352 (10th Cir.1983) (New Mexico).

As state law appears to control the definition of property under Section 1341, what constitutes mail fraud apparently is susceptible to fifty different interpretations.[7] What constitutes

---

that license. That question is not answered by *Salvatore* which rests upon Louisiana law.

[7]One final reason for the differences among the circuits is that many of the circuits are not looking at state law to determine whether the charged offense constitutes a deprivation of property. These circuits have looked to federal law for that answer. *Dadanian,* 856 F.2d at 1392 (Ninth Circuit citing *McNally* and *Carpenter* to hold gambling license not property ); *Murphy,* 836 F.2d at 253 (Sixth Circuit citing *McNally* to hold bingo license not property);*Granberry,* 908 F.2d at 280 (Eighth Circuit citing *Murphy* to hold school bus operator permit not property); *Kato,* 878 F.2d at 269 (Ninth citing *Murphy* and itself in *Dadanian* in holding pilot's license not property); *Schwartz,* 924 F.2d at 417 (Second Circuit citing *Kato, Murphy, Granberry* and itself in a prior case not involving a license, *United States v. Evans,* 844 F.2d 36 (2d Cir.1988), to hold arms export license not property); and *Ferrara,* 701 F.Supp. at 42 (citing *Evans* and *Murphy*to hold medical license not property). It is interesting to note that all of the circuits which rely on federal decisional law conclude that there is no property in a business license; but the three circuits which do find a property right in a license, *Bucuvalas* (1st Cir.), *Salvatore* (5th Cir.), and

mail fraud in Alabama may be insufficient to convict in Florida. Whether or not one finds such a result surprising, it is, apparently, the law.[8] Therefore, we look to Alabama law to determine whether a municipal bail bond license is government property in Alabama.

Shotts maintains that a business license is not property in Alabama. It is true that the Supreme Court of Alabama has held that a license to operate a bar or a package store is not property. *Ott v. Everett,* 420 So.2d 258, 261 (Ala.1982); *Ott v. Moody,* 283 Ala. 288, 216 So.2d 177 (Ala.1968); *O'Bar v. Town of Rainbow City,* 269 Ala. 247, 112 So.2d 790 (Ala.1959) ("There is no contract, vested right or property in a license as against the power of a state or municipality to revoke it in a proper case.") In Alabama, "[a] license to engage in the sale of intoxicants is merely a privilege with no element of property right or vested interest of any kind." *Broughton v. Alabama Alcoholic Beverage Control Bd.,* 348 So.2d 1059, 1060 (Ala.Civ.App.1977) (citing *Moody* ). A federal court in Alabama has recognized that Alabama law creates no protected property interest in a liquor license. *Arrington v. Dickerson,* 915 F.Supp. 1503, 1509 (M.D.Ala.1995) (citing *Broughton* ).

Neither does Alabama recognize any property interest in a salvage operator's business license. *Spradlin v. Spradlin,* 601 So.2d 76, 77 (Ala.1992). The *Spradlin* court reiterated that

---

*Martinez* (3d Cir.) rely on interpretations of specific state laws.

[8]Defining a federal crime by reference to state law is an unusual feature of the mail fraud statute. Even though the crime in all circuits is use of the mail to obtain property by fraud, one who embarks upon fraud would do well to consult state law to find out if he is obtaining property. If so, it is a federal crime. If the fraud is carefully practiced in a state which defines the thing obtained as not being property, one may escape federal prosecution. We note, however, that "the requirement that statutes give fair notice cannot be used as a shield by one who is already bent on serious wrongdoing." *United States v. Griffin,* 589 F.2d 200, 207 (5th Cir.1979).

Alabama recognizes no property interest in *any* business license as against the right of the state to revoke it. *Id.*[9]

The government does not dispute that Alabama law controls the definition of property under Section 1341. Neither does the government appear to disagree that under Alabama law, no one has a property interest in these bail bond licenses prior to their *issuance.*[10] The government, however, makes the very intriguing argument that "[a]t the moment the licenses were *typed* they became property within the meaning of the mail fraud statute." Because the "municipalities still controlled them" at that point, the licenses were government property[11] and obtaining them by fraud supports Shotts' mail fraud convictions.

The government finds support for its position in several cases which hold that even though an unissued license is not property, it may be property upon issuance. *See, e.g., Murphy,* 836 F.2d at 253; *Granberry,* 908 F.2d at 279; *Kato,* 878 F.2d at 269; *Ferrara,* 701 F.Supp. at 41. The government's contention appears to be that *issuance* of a bail bond license occurs at the moment it is typed.

---

[9]On the other hand, Alabama does recognize a property interest in a professional license. *Medical Ass'n of Alabama v. Shoemake,* 656 So.2d 863, 867 (Ala.Civ.App.1995) (medical license); *Averi v. Alabama State Bd. of Podiatry,* 567 So.2d 343, 344 (Ala.Civ.App.1990) (medical license); *Huckaby v. Alabama State Bar,* 631 So.2d 855, 857 (Ala.1993) (law license). The right to practice these professions in Alabama is "constitutionally protected as a valuable property right" which cannot be deprived without due process of law. *Huckaby,* 631 So.2d at 857. The government apparently concedes that these licenses are not analogous to the bail bond licenses at issue in this case as it does not even cite them, much less argue that they control.

[10]The government states, "[t]hus, even under Alabama law, licenses are indeed some form of property, at least once they are issued."

[11]Apparently the government subscribes to the theory that possession in ninetenths of the law.

While this is certainly a creative approach, we are not persuaded by it. First of all, none of these cases holds that even an issued license is Section 1341 property. These courts have merely noted that *whatever* an issued business license might be to the licensee, it is definitely not the property of the state,[12] either before or after issuance. Therefore, even if a license becomes property upon being typed, it would not be the state's property. Under these cases, it merely "might" become the property of the licensee.

Furthermore, those courts which distinguish between an issued and unissued license have premised this distinction upon the due process rights which may inure to the licensee upon issuance of the license. *Toulabi,* 875 F.2d at 125 ("license may be property from the driver's perspective, in the sense that he may not be compelled to surrender the entitlement except on proof of wrongdoing"); *Kato,* 878 F.2d at 269 ("licenses, while "property' of the recipient once issued, are not property of the government either before or after they are issued"); *Murphy,* 836 F.2d at 253-54 ("the bingo license may well be "property' once issued ... but certainly an unissued certificate of registration is not property of the State of Tennessee and once issued, it is not the property of the State of Tennessee."). The Supreme Court also recognizes this form of "property" in a license. *Mackey v. Montrym,* 443 U.S. 1, 10 n. 7, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979) (driver's license); *Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) (driver's license); *Barry v. Barchi,* 443 U.S. 55, 64 n. 11, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (license to train horses).[13]

---

[12]We are aware that these are municipal licenses, but will ignore the distinction between the state and its subdivisions for the purposes of this discussion since we believe it irrelevant to the issue of whether the business licenses are the property of the government.

[13]The Fifth Circuit has expressed its impatience with the "esoteric" distinction between issued and unissued licenses. *Salvatore,* 110 F.3d at 1140. We do not agree, however, that the courts making this distinction "provide no justification whatsoever for making the distinction." *Id.* We

This recognition of a form of property in a license stems from the modern theory that property is a "bundle of rights."[14]  *See United States v. Frost,* 125 F.3d 346, 367 (6th Cir.1997). These rights, however, may exist only in a particular set of hands.  The right of due process prior to revocation of a license, for example, exists only in the hands of the licensee.  If this is property, it is not the state's property.

These cases, therefore, do not support the government's theory that *Alabama* has a property interest in a bail bond license.[15]  Even if such a license might be considered the licensee's property, from the government's perspective the license is "a promise not to interfere rather than a sliver of property."  *Toulabi,* 875 F.2d at 125.

---

also do not agree that the distinction is based upon the idea that a license has "great value in the hands of the licensee but an unissued license has negligible value in the hands of the government."  *Id.* at 1140.  The distinction seems quite clearly to be based upon the difference in the rights which attach to the license in the hands of the licensee.

[14]*See* Charles A. Reich, 73 Yale L.J. 733 (1964).  On the other hand, some courts have understood *McNally* to direct them to the esoterica of ancient property law to divine whether a particular item is some form of property.  *See e.g., Bucuvalas,* 970 F.2d at 945 (license is a property right analogous to fee simple determinable with a possibility of reverter); *Turoff,* 701 F.Supp. at 987(discussing whether a license might be an easement in gross).  In fact, the Fifth Circuit, in holding a video poker license to be property in the face of specific statutory language to the contrary ("Any license issued or renewed under the provisions of this Chapter is not property ..." ), did so because "when determining whether something is "property' for purposes of the federal mail fraud statute, it is appropriate to look not only to state statutes but also to "traditional property law.' "  110 F.3d at 1142.

[15]The only other cases cited by the government in support of its position are *Bucuvalas, Martinez* and *United States v. Turoff,* 701 F.Supp. 981 (E.D.N.Y.1988).  *Turoff* is inapposite because the New York City taxicab medallions held to be property were "tangible personal property" which had a substantial market value.  701 F.Supp. at 987.  The court in *Turoff* specifically noted that "[a] mere license, on the other hand, is nothing more than a personal, revocable privilege."  *Id.* at 988.  *Bucuvalas* and *Martinez* are inapposite because neither interprets Alabama law, much less the status of a bail bond license in Alabama.

12

The government has offered no other theory of how these licenses might be considered the property of Alabama.[16] We conclude that, under Alabama law, a municipal license to operate a bail bonds business is not government property, either before or after being typed. We hold, therefore, that neither the mailing of a fraudulent application for such a license nor the receipt in the mail of the license constitutes the federal crime of mail fraud under 18 U.S.C. § 1341. We reverse Shotts' mail fraud convictions because the jury may have convicted upon that legally insufficient theory.[17]

III.

Shotts was convicted in Count 26 of making a false material declaration before the grand jury ("perjury") in violation of 18 U.S.C. § 1623 by stating that he did not "own" a bail bonds business. He argues that this conviction must be reversed because this testimony was "literally true." We review this question of law *de novo. Shenberg,* 89 F.3d at 1478.

Before the grand jury, Shotts was advised he was a target, and asked the following questions:

Q: Do you own a bail bonds business?

A: No, sir.

Q: Have you been associated in some fashion with a bail bonds business?

A: I would at this time invoke my right of self-incrimination, Your Honor.

Q: All right.

A: I have a client that is a bail bonds company.

---

[16]Nor has the government called to our attention any Alabama statute which creates these licenses so that we might review it to see what interest the state might have in them. *Cf. Ward v. United States,* 845 F.2d 1459, 1462 (7th Cir.1988) (Illinois statute creates a security interest in a bail bond which might be sufficient to support a mail fraud prosecution).

[17]See Note 3 *supra.*

13

Q: Well, have you in the past either been an officer in or had an interest in a bail bonds company, any time prior to today?

A: I would respectfully decline to answer the question on the ground it might tend to incriminate me.

Shotts contends that the question regarding his "ownership" of the bail bonds business was "fundamentally ambiguous" and that, even so, his answer was "literally true." If so, Shotts' conviction for perjury is due to be reversed.

The Supreme Court has held that a perjury conviction under 18 U.S.C. § 1621 cannot be based upon a statement, however misleading or incomplete, that is the "literal truth." *Bronston v. United States,* 409 U.S. 352, 360, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). An answer to a question may be non-responsive, or may be subject to conflicting interpretations, or may even be false by implication. Nevertheless, if the answer is literally true, it is not perjury. *Id.* at 362.

*Bronston* has been extended to Section 1623, under which Shotts was convicted. *United States v. Abrams,* 568 F.2d 411, 421 (5th Cir.1978). In *Abrams,* the defendant was convicted of violating Section 1623 based upon her testimony before the grand jury in response to questions about what she "would do" rather than what she had actually done. Her answers to the poorly phrased questions were literally true. The Fifth Circuit reversed her conviction.[18]

Many other courts have reversed convictions based upon "literally true" answers. *United States v. Boone,* 951 F.2d 1526, 1536 (9th Cir.1991); *United States v. Lighte,* 782 F.2d 367, 372 (2d Cir.1986); *United States v. Eddy,* 737 F.2d 564, 567 (6th Cir.1984); *United States v. Niemiec,* 611 F.2d 1207, 1210 (7th Cir.1980); *United States v. Tonelli,* 577 F.2d 194, 198 n. 3 (3d Cir.1978);

---

[18]We are, of course, bound by this holding. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

14

*United States v. Paolicelli,* 505 F.2d 971, 973 (4th Cir.1974). For example, in *Eddy,* the Sixth Circuit reversed a Section 1623 conviction where the defendant denied submitting an "official" college transcript and diploma to a government agency. The denial was "literally true" because the defendant had submitted falsified, not official, documents. 737 F.2d at 567-69. In *Boone,* the defendant denied going through certain company files and taking out documents. His conviction was reversed because the denial was literally true since the discarded documents were kept in different files. 951 F.2d at 1536. Finally, in *Tonelli,* the government qualified its question by defining a particular term. The defendant's answer to the question so defined was literally true, and the prosecutor made no further reference to any "other concepts" that he might have intended to be included within the question. In reversing the perjury conviction, the Third Circuit observed that "[T]he defendant could be said to have evaded the broad "other concepts' which the prosecutor wished to probe. A charge of perjury, however, is not a substitute for careful questioning on the part of the prosecutor...." 577 F.2d at 198.

Shotts maintains that his answer, like those above, was literally true. Under Alabama law, a corporation is "owned" by its shareholders. *See American Cast Iron Pipe Co. v. Commerce & Industry In. Co.,* 481 So.2d 892, 896 (Ala.1985) ("In Alabama, the shareholders are the equitable owners of corporate assets, including real property."); *Williams v. North Alabama Exp.,* 263 Ala. 581, 83 So.2d 330, 333 (1955) ("stockholders owing all the shares of stock of a corporation are the equitable owners of its assets"). *See generally* H. Henn & J. Alexander, *Laws of Corporations* at 491 (Practicing Law Institute, 1991) ("shareholders "own' the corporation ...").

It is undisputed that Shotts never owned any of the shares of stock of the JC Bail Bonds business. His answer to the question whether he "owned" the company was literally true as a matter of both Alabama and general law.[19]

Furthermore, Shotts was not asked whether he had "nominees" own the bail bond business for him. When asked whether he was "associated with" or had "an interest in" a bail bonds company, he invoked his Fifth Amendment privilege not to answer. These responses indicate that Shotts was unwilling to perjure himself regarding his association with JC Bail Bonds, and permit an inference that his willingness to answer the "ownership" question was because he knew that under the law he was not the "owner" of the corporation.[20] *See United States v. Marchisio,* 344 F.2d 653, 661 (2d Cir.1965) (we may consider extrinsic evidence that demonstrates how a declarant interpreted a question).

The government's argument is that Shotts ignores the "context" of his testimony. He was, "in fact," the owner even if he didn't own the stock. He had told others he "owned" the business. When asked before the grand jury if he owned a bail bond business, "he knew ... what was meant by the question." No authority is cited.

---

[19]Ordinarily, absent a finding of fundamental ambiguity, a reviewing court's role is quite limited. Where, however, the defendant's answer is literally true, we need not decide whether the question itself was so fundamentally ambiguous it could not sustain a perjury conviction. Nevertheless, we note that if the government is correct that, in some sense, Shotts "owned" the bail bond business, then the question was fundamentally ambiguous. The government may not send people to prison for failing to correctly guess the government's meaning. *See Lighte,* 782 F.2d at 374.

[20]Indeed, had "ownership" of the business led to acquittal instead of conviction, and Shotts had testified that he was the owner of the business, the government might still have charged him with lying to the grand jury.

16

A perjury conviction must rest on the utterance by the accused of a false statement; it may not stand on a particular interpretation that the questioner places upon an answer. *Lighte,* 782 F.2d at 374 (citing *Bronston,* 409 U.S. at 360, 93 S.Ct. 595). The government cannot require Shotts to interpret its question in a way that is contrary to the law of Alabama, and he may not be convicted of perjury if he does not. *Bronston* expressly places on the questioner the burden of pinning the witness down to the specific object of the inquiry. *Id.* As then Chief Justice Burger wrote, "Precise questioning is imperative as a predicate for the offense of perjury." 409 U.S. at 362, 93 S.Ct. 595. "If a witness evades, it is the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination." *Id.* Any "special problems arising from the literally true but unresponsive answer are to be remedied through the "questioner's acuity' and not by a federal perjury prosecution." *Bronston,* 409 U.S. at 362, 93 S.Ct. 595.

Furthermore, the prosecutor's purpose must be to obtain the truth. Perjury, of course, thwarts that proper purpose. It must not be the prosecutor's purpose, however, to *obtain* perjury, thus avoiding more precise questions which might rectify the apparent perjury.

Under these circumstances, we reverse Shotts' conviction for making a false statement to the grand jury. Even if Shotts' answer was evasive, nonresponsive, intentionally misleading and arguably false, it was literally true and cannot support a conviction under Section 1623.

IV.

Shotts appeals his conviction on Count 24 of the indictment which charges that he violated 18 U.S.C. § 1512(b)(3). This section makes it a crime to:

> knowingly use[ ] intimidation or physical force, threaten [ ], or corruptly persuade [ ] another person, or attempt to do so ... with intent to ... hinder, delay or prevent the communication

17

to a law enforcement officer ... of information relating to the commission or possible commission of a Federal offense....

The indictment alleges that Shotts committed the offense by "corruptly persudad[ing] and attempt[ing] to corruptly persuade an employee of his law office to not tell anything to law enforcement agents investigating Jack Montgomery's activities." Shotts asserts that his conviction on this count must be reversed because the "corruptly persuade" language of Section 1512(b) is unconstitutionally vague and overbroad, and also because the government did not prove the charged crime.

The constitutional claim is one of first impression in this circuit, and we review it *de novo. United States v. Paradies,* 98 F.3d 1266, 1282 (11th Cir.1996). In reviewing the sufficiency of the evidence, we construe it in the light most favorable to the government, *United States v. Tapia,* 59 F.3d 1137 (11th Cir.1995), resolving all questions of reasonable inference and credibility in the government's favor. *United States v. Lyons,* 53 F.3d 1198 (11th Cir.1995).

Shotts' constitutional attack on Section 1512(b) relies on *United States v. Poindexter,* 951 F.2d 369, 378 (D.C.Cir.1991). Poindexter had been President Reagan's National Security Advisor. He was accused of lying during the course of a congressional investigation of the Iran-Contra affair and charged under 18 U.S.C. § 1505 which prohibits the making of a false statement to the Congress. The District of Columbia Circuit reversed his conviction, holding that the term "corruptly" as used in Section 1505 was unconstitutionally vague as applied to Poindexter's actions. The court reasoned that the term was so imprecise that "men of common intelligence must necessarily guess at its meaning and differ on its application." *Id.* at 378.

Shotts urges us to extend the *Poindexter* view of Section 1505's "corruptly" to Section 1512(b). We have recently declined a similar invitation. *United States v. Brenson,* 104 F.3d 1267

18

(11th Cir.1997). In *Brenson,* the defendant urged us to extend *Poindexter* to 18 U.S.C. § 1503(a), the omnibus clause of the federal obstruction-of-justice statute, which makes it a crime to "corruptly" endeavor to obstruct the due administration of justice. We refused, holding that Section 1505 and 1503 are too materially different for the construction of one to guide the construction of the other, and that *Poindexter* is limited to the specific illegal conduct charged in that case.[21] *Id.* at 1280.

We again decline to extend *Poindexter* to another section of the obstruction-of-justice statutes. We continue to believe that *Poindexter* must be read narrowly, and not as a broad indictment of the use of "corruptly" in the various obstruction-of-justice statutes.[22]

On the contrary, we agree with the Second Circuit that "corrupt" as used in Section of 1512(b) is neither unconstitutionally overbroad or vague. *United States v. Thompson,* 76 F.3d 442 (2d Cir.1996). In *Thompson,* the Second Circuit rejected the argument, also advanced here by Shotts, that Section 1512(b) criminalizes persuasion and is, therefore, an impermissible regulation of protected speech. The court noted that Section 1512(b) does not prohibit all persuasion, but only that which is "corrupt." By targeting only such persuasion as is "corrupt," Section 1512(b) clearly limits only constitutionally unprotected speech, and is not, therefore, overbroad. *Id.* at 452.

---

[21]The challenge in *Brenson* was to Section 1503(a) as applied in that case. The Fifth Circuit, in binding precedent, had already upheld the use of "corruptly" in Section 1503 against a facial attack. *United States v. Howard,* 569 F.2d 1331, 1337 n. 9 (5th Cir.1978).

[22]In fact, the District of Columbia Circuit itself has avoided extending its interpretation of Section 1505 to Section 1512(b). *United States v. Morrison,* 98 F.3d 619, 629 (D.C.Cir.1996). In upholding Morrison's conviction against the claim that the "corrupt" language in Section 1512(b) is unconstitutionally vague, the court held, instead, that the evidence against him was sufficient to establish that he had persuaded another to violate a legal duty, which, even under *Poindexter,* satisfies the "corrupt"element of these statutes. *Id.*

19

*Thompson* also rejected Shotts' argument that Section 1512(b) is unconstitutionally vague. The Second Circuit noted that the same language in Section 1503(a), the omnibus obstruction-of-justice provision, has long been upheld as meaning with an "improper purpose." *See e.g., United States v. Cintolo,* 818 F.2d 980, 990-91 (1st Cir.1987); *United States v. Rasheed,* 663 F.2d 843, 852 (9th Cir.1981); *United States v. Fasolino,* 586 F.2d 939, 941 (2d Cir.1978); *Martin v. United States,* 166 F.2d 76, 79 (4th Cir.1948). So defined, "corrupt" is a scienter requirement which provides adequate notice of what conduct is proscribed. *Id.* (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). Section 1512(b), concluded the Second Circuit, is not unconstitutionally vague because it forbids only persuasion with an improper purpose.

We are aware that a majority of a panel of the Third Circuit has declined to follow *Thompson. United States v. Farrell,* 126 F.3d 484 (3d Cir.1997). The majority viewed the application of Section 1503's definition of "corrupt" to Section 1512(b) to be inappropriate because "corruptly" provides the only intent element of Section 1503, while Section 1512 contains explicit intent elements in addition to the term "corruptly." *Id.* at 489-90. "Thus, because the "improper purposes' that justify the application of § 1512(b) are already expressly described in the statute, construing "corruptly' to mean merely "for an improper purpose' (including those described in the statute) renders the term surplusage, a result that we have been admonished to avoid." *Id.* (citing *Ratzlaf v. United States,* 510 U.S. 135, 141, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994)). The majority concluded that "more culpability is required [to violate Section 1512(b) ] than that involved in the act of attempting to discourage disclosure in order to hinder an investigation." *Id.* at 489.

20

This conclusion drew a strong dissent, however, which noted that both the legislative history of Section 1512 and prior decisions support the Second Circuit's contrary position in *Thompson. Id.* at 492 (Campbell, J. dissenting). Section 1512's "corrupt persuasion" language was added by Congress in 1988.[23] Senator Biden, one of the drafters of the 1988 Amendments, stated at the time that the intention was "merely to include in section 1512 the same protection of witnesses from noncoercive influence that was (and is) found in section 1503." *Id.* The "motivated by an improper purpose" definition of "corrupt" in Section 1512(b), then, is correctly informed by Section 1503's long-standing interpretation.

Furthermore, the scienter role played by "corruptly" is not redundant, according to the dissent, because "not all actions taken with the intent to hinder or obstruct justice necessarily violate § 1503 or § 1512." *Id.* at 493. For example, Section 1512 does not prohibit constitutionally protected speech, even if such conduct has the effect of hindering an investigation. *Id.* (citing *Thompson,* 76 F.3d at 452).

We believe that the Second Circuit and the dissent in *Farrell* have the better reasoned position on this issue. It is reasonable to attribute to the "corruptly persuade" language in Section 1512(b), the same well-established meaning already attributed by the courts to the comparable language in Section 1503(a), i.e., motivated by an improper purpose. We are unwilling to follow the Third Circuit's lead in imposing a requirement for an additional level of culpability on Section 1512(b) in the absence of any indication that Congress so intended and in the face of persuasive evidence that it did not.

---

[23]The amendment appeared in the Anti-Drug Abuse Act of 1988, Pub.L. No. 100-690, 102 Stat. 4181.

21

By prohibiting only that persuasion which has an improper purpose, Section 1512(b) does not impermissibly limit protected speech, and provides adequate notice that such persuasion is proscribed. Therefore, we hold that the term "corruptly" as used in 18 U.S.C. § 1512(b) is neither unconstitutionally broad nor vague.[24]

Having upheld Section 1512 against Shotts' constitutional attack, we turn now to Shotts' contention that the government did not present sufficient evidence that he corruptly persuaded his secretary, Kandy Kennedy, not to talk to law enforcement agents investigating Montgomery. The evidence offered by the government in support of this charge was the following testimony by Kennedy:

Q: Were there any conversations in the office about the FBI after Mr. Montgomery's house was searched?

A: Yes.

Q: Was Mr. Shotts present?

A: Yes

Q: Did he say anything about the FBI to you?

A: I asked him about it. I asked him.

Q: What did he say?

A: He said just not say anything and I wasn't going to be bothered.

---

[24]We have also upheld the use of the term "corruptly" in 18 U.S.C. § 7212(a) against a vagueness attack. *United States v. Popkin,* 943 F.2d 1535 (11th Cir.1991). In *Popkin,* we reached the conclusion that "corruptly" is used for the purpose of " "forbidding those acts done with the intent to secure an unlawful benefit either for oneself or for another.' " *Id.* at 1540 (quoting *United States v. Reeves,* 752 F.2d 995 (5th Cir.1985)). Thus defined, we held the term "gives clear notice of the breadth of activities that are proscribed." *Id.*

22

Shotts asserts that this testimony proves only that Kennedy asked Shotts about talking to the FBI and that he observed that if she did not talk to the FBI, she would not be bothered. He maintains that the testimony is insufficient to prove that he threatened or intimidated her, offered her any inducement, or persuaded her in any way not to talk to the FBI.

The government argues that Shotts' use of the term "bother" could have included the possibility of Kennedy's being prosecuted and jailed for her involvement with the bail bond business. In this context, the government contends that Shotts' comment was an attempt to frighten Kennedy into not talking to the FBI.

The jury was correctly charged that they must find that Shotts acted "knowingly and dishonestly with the specific intent to subvert or undermine the integrity or truth-seeking ability of an investigation by a federal law enforcement officer." The jury heard Kennedy's testimony. While not overwhelming, the jury could reasonably have inferred from this testimony that Shotts was attempting with an improper motive to persuade Kennedy not to talk to the FBI. There was sufficient evidence from which the jury has determined the facts. Therefore, we affirm Shotts' conviction on this count.

V.

Shotts was convicted in Count 22 of instructing his employee, Larry Eddy, to destroy "Jack bonds" in violation of 18 U.S.C. § 1512(b)(2). This section makes is a crime to "corruptly persuade" someone to destroy evidence with the intent to impair its availability for use in an official proceeding.

23

Shotts has two complaints about his conviction on this count.[25]  First, he asserts that there was insufficient evidence that the bonds were actually destroyed, and second, that the indictment is deficient because it did not allege the official proceeding in which the destroyed evidence was to be used.

Larry Eddy did not testify at trial.  The evidence on this count was in the testimony of Kandy Kennedy.  She testified that after Montgomery's house was searched, the following took place:

Q: What if anything did he say about what had happened.

A: Nothing. We just took the Jack Bonds out of my desk drawer and they were taken away and destroyed.

Q: Who is "we?"

A: I took them out.  I either handed them to Jesse or Larry Eddy but Larry Eddy was instructed to destroy them.

Q: Who instructed Larry Eddy to destroy the Jack bonds?

A: Jesse Shotts.

The government offered no further proof that the bonds were actually destroyed.  The jury was instructed that it must find that Shotts corruptly persuaded and caused Eddy to destroy the bonds.  Shotts contends that the jury was required to find that Eddy actually destroyed the bonds, and that Kennedy's testimony was insufficient to establish this fact.  We review these contentions *de novo.  United States v. Waymer,* 55 F.3d 564, 570 (11th Cir.1995).

 Neither party has cited any authority to us regarding whether the statute requires that the evidence actually be destroyed.  Even assuming that the statute requires such an event to occur,

---

[25]We have dealt with Shotts' constitutional challenge to this conviction based upon the alleged vagueness of Section 1512(b)'s "corruptly persuade" language.  See Section IV. above.

24

however, Kennedy's testimony is sufficient proof that it did. Kennedy's testimony was that she took the bonds out of her desk drawer, she handed them to "Jesse" or to Eddy, Shotts instructed Eddy to destroy them, and they were "taken away and destroyed." The jury was instructed that they must find that Shotts intended to cause a person to destroy the bonds. Kennedy's testimony can reasonably support that inference. The jury must have drawn this inference because they convicted Shotts on this count. We find no merit to this claim.

Neither are we persuaded that this count is legally insufficient for failure to identify the official proceeding at which the evidence would have been presented. *See United States v. Murphy,* 762 F.2d 1151, 1153 (1st Cir.1985) (failure to identify *in any way* the official proceeding did not sufficiently apprize defendants of charges). Count 22 realleges the Introduction to the indictment. Paragraphs five through seven of the Introduction describe the FBI's investigation and the federal grand jury proceedings before which Jack Montgomery and Shotts were called to testify. Such allegations meet the requirements of *Murphy.*

## VI.

Shotts' convictions were divided into two groups by the Presentence Report and subsequently by the district court at sentencing. The first group contained the convictions on the mail fraud counts and the perjury count. These sentences must be set aside because we have reversed Shotts' convictions on these counts.

The second group contained Shotts' convictions on Counts 24 and 26, the obstruction of justice counts, which we affirm. Shotts' final argument on appeal is that his sentence on these counts was incorrectly calculated under the Sentencing Table. An incorrect calculation under the Sentencing Table is reviewed as an incorrect application of the Sentencing Guidelines. *Williams*

*v. United States,* 503 U.S. 193, 201, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992). This court reviews *de novo* the district court's interpretation and application of the guidelines. *United States v. Zapata,* 139 F.3d 1355, 1357 (11th Cir.1998).

The obstruction of justice counts had an adjusted offense level of 14. With a criminal history category I, the guideline range for an offense level of 14 is 15-21 months. The district court imposed a sixty-month sentence on these counts, to run concurrently with the sixty-month sentence imposed on the separately grouped mail fraud counts.[26] Shotts contends that this sentence was erroneous as a matter of law and must be vacated.[27]

The government argues that because Shotts was convicted on multiple counts, the district court looked to and correctly sentenced under Sentencing Guideline Section § 5G1.2. The government concedes, however that "If these were the only two crimes on which the defendant was convicted, his argument may have some merit." Because we have reversed Shotts' mail fraud and perjury convictions, he stands now convicted of only these two obstruction of justice counts. Accordingly, we shall vacate his sentence on these two counts and remand for re-sentencing on them.

VII.

Counts 1 through 17 of the indictment are insufficient as a matter of law because they allege that Shotts deprived Alabama of its property in the form of a bail bond license and under Alabama law, such license is not property. Count 26 must be reversed because Shotts' alleged false statement

---

[26]The district court rejected any upward departure that might explain the sentence.

[27]Although Shotts did not raise this objection at sentencing, we consider it because an incorrect application of the Sentencing Guidelines is plain error. *Williams v. United States,* 503 U.S. 193, 201, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992).

to the grand jury was literally true and cannot form the basis for a perjury conviction. Counts 22 and 24 are neither legally nor constitutionally deficient, and the proof on these counts was sufficient to sustain Shotts' convictions on them.

Accordingly, the convictions on Counts 1 through 17, and 26 are REVERSED and the sentences on these counts are VACATED. The convictions on Counts 22 and 24 are AFFIRMED, but the sentences on these two counts are VACATED and the case is REMANDED.